898 So.2d 1219 (2005)
STATE of Louisiana
v.
Shawn J. HIGGINS.
No. 2003-KA-1980.
Supreme Court of Louisiana.
April 1, 2005.
*1224 G. Benjamin Cohen, William Martin Sothern, R. Neal Walker, New Orleans, Counsel for Applicant.
Hon. Charles C. Foti, Jr., Attorney General, Hon. Paul D. Connick, Jr., District Attorney, Cameron Matthew Mary, Assistant District Attorney, Donald Albert Rowan, Jr., Assistant District Attorney, Terry Michael Boudreaux, Assistant District Attorney, Juliet Lee Clark, Assistant District Attorney, Counsel for Respondent.
KIMBALL, Justice.
This is a direct appeal from a conviction of first degree murder and a sentence of death. La. Const. art. V, § 5(D). The defendant's appeal is based on a total of twenty-eight assignments of error. For the reasons that follow, we reverse the defendant's first degree murder conviction and death sentence, but find the record supports the conclusion that the defendant is guilty of second degree murder and remand the case to the trial court for entry of judgment of guilty of second degree murder and for resentencing of the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence pursuant to La. R.S. 14:30.1.

Facts and Procedural History
On the night of October 24, 1998, Donald Price cashed in his winnings at Boomtown Casino in Harvey, and drove his white Ford Explorer to Marrero. Security cameras obtained from the casino indicate that Price left the building at 11:54 p.m. At 12:13 a.m. on October 25th, less than 20 minutes after Price was recorded leaving the casino, police received a 911 call indicating someone had been shot on Cross Street between Second Avenue and the Westbank Expressway in Marrero. At approximately 12:16 a.m., a Jefferson Parish Sheriff's Officer arrived on the scene and found Price's lifeless body. Price had been shot once in the head from a distance of more than two feet away and had died almost instantly from the wound. After investigating the scene, police noted that nothing appeared to have been taken in the encounter. Police found Price's necklace still on his neck, his watch by his wrist, his wallet, which contained $223[1], still in his pocket, and the keys to his vehicle, which was parked nearby, clutched in his right hand.
Shortly after midnight, Ruby Wells heard gunshots from her bedroom on Second Avenue, went to the window, and looked out. She saw a man run into her neighbor's yard, jump the fence into her yard, and run alongside her house toward her shed. Ms. Wells called the police who subsequently searched her yard and found hidden in a broken piece of furniture a blue and red flannel shirt, a black visor, a pair of black gloves, a revolver, and a bandana. Closer examination of the bandana revealed trace amounts of blood. Police confiscated the items, and technicians later determined that the revolver police recovered had fired the gunshot which proved fatal for Price.
*1225 On October 26, 1998, police received word that the defendant, Shawn Higgins, and a man named Melvin Jenkins may have been involved in the killing. Based on tips from the defendant's girlfriend and a man that had associated with the pair on the night of the murder, police obtained arrest warrants for both suspects, and both men turned themselves in during the ensuing days. While the defendant awaited further state action in the instant case, a Jefferson Parish grand jury indicted him for an unrelated killing, that of Carl Jackson, which occurred less than 24 hours after the shooting of Donald Price.[2] On January 26, 1999, after realizing that the bandana recovered near the weapon used to kill Donald Price had enough blood on it to conduct DNA testing, officers procured a warrant authorizing them to draw blood samples from both the defendant and Jenkins. The test results indicated that the blood on the bandana matched that of the defendant.
On February 7, 2000, 17 months after Price's murder, Wanda Brown informed police that she had witnessed the killing of Donald Price. Specifically, Brown informed JPSO Detective Michael Tucker that on the night in question she had followed the victim out of the Westbank Lounge after a night of drinking, and watched as a man approached, engaged the victim in a heated discussion, then shot him in the head. During this meeting, Brown identified the defendant from a photographic lineup as the man she saw shoot Price and subsequently gave police a taped statement memorializing her recollection of events.
After obtaining a conviction against the defendant in the unrelated Jackson murder case, investigators continued to pursue information regarding the defendant's role in the Price killing. On August 24, 2000, after receiving testimony from Wanda Brown, Melvin Jenkins, and Detective Michael Tucker, a Jefferson Parish grand jury indicted the defendant with the first degree murder of Donald Price. At a subsequent pretrial hearing, the state informed the defendant that Tucker's grand jury testimony differed from that of Brown. Tucker explained at the hearing that he had "just made a mistake" during a portion of his grand jury testimony. Based on the discrepancy, the defendant filed a motion to quash, which the trial court denied. The trial court also denied the defendant's request to access portions of Jenkins's and Tucker's grand jury testimony, and the defendant sought pretrial writs. This court granted the defendant's application in part, and ordered the trial court to review the grand jury testimony in camera and to tender to the defendant any exculpatory evidence to which he is entitled. State v. Higgins, 02-1241 (La.5/6/02), 821 So.2d 1281.[3]
Jury selection began on May 6, 2002, and the parties gave opening statements three days later. The jury found the defendant guilty as charged. At the conclusion of the penalty phase, the jury returned a sentence of death, finding two *1226 aggravating circumstances: (1) that the offender was engaged in the perpetration or attempted perpetration of an armed robbery and (2) that the offender had been previously convicted of an unrelated murder. La.Code Crim. Proc. art. 905.4(A)(1) and(3). The trial court subsequently heeded the jury's recommendation and sentenced the defendant to death by lethal injection.

Law And Discussion
On appeal, the defendant alleges twenty-eight assignments of error. Because this court vacates the defendant's first degree murder conviction and death sentence for the reasons given hereafter, we find it unnecessary to address any assignments of error relating to the penalty phase of the defendant's trial. State v. Hart, 96-0697, p. 5 (La.3/7/97), 691 So.2d 651, 655. However, because we find the evidence sufficient to support a conviction of the lesser, included charge of second degree murder, we will address those assignments of error relating to the pretrial issues and the guilt phase which would, if meritorious, require this court to remand the case for a new trial.[4]

Sufficiency of the Evidence
In assignments of error 1 and 2, the defendant contends that his conviction and sentence should be reversed because they rest upon insufficient evidence to support the jury's finding that the killing took place during the course of an armed robbery, or an attempted armed robbery, and insufficient evidence to support the jury's finding that he was the perpetrator of this crime. For both claims, the defendant primarily relies on the assertion that the testimony of the state's sole eyewitness, Wanda Brown, regarding her observations of the events on the morning in question was not reliable, primarily because she was intoxicated at the time of the crime.
When reviewing the sufficiency of the evidence to support a conviction, this court is controlled by the standard set forth by the United States Supreme Court in Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979), which dictates that to affirm a conviction "the appellate court must determine that the evidence, viewed in the light most favorable to the prosecution, was sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt." State v. Captville, 448 So.2d 676, 678 (La.1984). Moreover, in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79; State v. Jones, 97-2591, p. 7 (La.App. 4 Cir. 9/8/99), 744 So.2d 165, 169.
The defendant was indicted on charges of first degree murder; specifically, he was charged with the specific intent killing of Price, committed during the perpetration or attempted perpetration of an armed robbery. La. R.S. 14:30(A)(1). Thus, to convict the defendant of first degree murder, the state must have established the following essential elements beyond a reasonable doubt: (1) the defendant had the required specific intent to kill or inflict great bodily harm (2) while he was engaged in the perpetration or attempted perpetration of an armed robbery. Id; State v. Bright, 98-0398, p. 10 (La.4/11/00), 776 So.2d 1134, 1141. The defendant does not contest, *1227 in brief or oral argument, that the gunman had the requisite specific intent to commit the murder nor does he contest that the gunman actively desired the proscribed criminal consequences to flow from his actions. This court has indicated repeatedly that deliberately pointing and firing a weapon at close range fully supports a finding of specific intent to kill or inflict great bodily harm. La. R.S. 14:10(1); State v. Williams, 01-1650, p. 16 (La.11/1/02), 831 So.2d 835, 849; State v. Tassin, 536 So.2d 402, 411 (La.1988). Rather, the defendant alleges lack of sufficient evidence to prove the underlying armed robbery or attempted armed robbery. To support a conviction of armed robbery, the state must establish beyond a reasonable doubt that the defendant took something of value from the victim or under the control of the victim, through the use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64. An attempted armed robbery is sufficient to support the capital offense charged if the state can prove that the defendant had the specific intent to commit armed robbery and did or omitted an act for the purpose of and tending directly toward the accomplishment of that goal. La. R.S. 14:27. However, mere preparation is not enough to constitute an attempt to commit the crime intended, but lying in wait with a dangerous weapon and with the requisite intent is sufficient. Id.
In its opening statement during the instant trial, the state failed to mention precisely what "thing of value" it was alleging the defendant took or attempted to take from the victim during the course of the killing to constitute the alleged armed or attempted armed robbery. In fact, the first witness even to mention "anything of value" found on or near the victim was the state's sixth witness, Deputy Michael Moscona. During both direct and cross-examination, Deputy Moscona testified that he took photographs of the victim and his belongings following the killing for purposes of the police investigation. Deputy Moscona testified that at the time of the investigation, the victim was found to be in possession of his wallet containing $223 in cash, his watch, and a gold necklace. Further, he admitted that the victim's 1996 Ford Explorer was found parked only a few feet from the victim and the keys to the Explorer were found clutched in the victim's right hand. During cross-examination, Deputy Moscona acknowledged that "it appeared that nothing had been taken from the victim." The state first mentioned the words "armed robbery" at trial during re-direct examination of Deputy Moscona when it asked him the number of "botched armed robbery murders" he had investigated during his tenure in law enforcement. Over defense counsel's objection, the court allowed Moscona to answer that he had investigated such killings; however, the witness was not allowed to answer the state's question on whether it struck him as unusual that nothing appeared to be missing from the victim.
The only direct testimony presented by the state intimating that the defendant may have attempted to commit an armed robbery at the time of the killing was the state's witness Wanda Brown.[5] Initially, *1228 during the state's direct examination, Brown testified that immediately before the shooting, "[i]t appeared to me that [the defendant and the victim] was arguing about something. I couldn't hear what they was [sic] conversing about." During cross-examination, Brown repeated that she could not hear any of the words exchanged between the defendant and the victim, despite professing to be standing only five to six feet away from the pair. Specifically, Brown testified that she merely witnessed the two men gesturing back and forth while facing one another, stating:
Them two was in the middle of the street, having some kind of confrontation. Never could hear what they was arguing over; hand gestures. Next thing I know, he shot him. I'm still there, shocked.
Furthermore, Brown acknowledged that she did not see the defendant take or attempt to take anything from the victim during the incident. The following colloquy between defense counsel and Brown ensued regarding this topic:
Mr. Riehlmann: Okay. Now, as close as you were, three to four to five to six feet, whatever you have estimated it to be, you never saw the gunman try to take anything from Mr. Price; isn't that true?
Ms. Brown: Never saw him trying to go in his pockets or nothing like that.
Mr. Riehlmann: Never saw him try to take anything.
Ms. Brown: Never saw him trying to take nothing.
Mr. Riehlmann: Never saw him try to grab for anything.
Ms. Brown: No.
Mr. Riehlmann: Okay. Didn't go through his pockets.
Ms. Brown: No.
Mr. Riehlmann: And in fact, as soon as the shot was fired, the gunman fled.
Ms. Brown: Fled, yes.
Brown then testified that after she witnessed the killing, she returned to "the club," informed the patrons that someone had been shot outside, and demanded that the management turn the music off to provide patrons with a "moment of meditation."
During re-direct examination, the state again brought up the confrontation between the defendant and the victim preceding the shooting, culminating in Brown testifying that the confrontation appeared to be an attempted armed robbery through the following testimony:
Mr. Mary: You said that the gunman, the person that shot Donald Price, and Donald Price appeared to be having an argument, right?
Ms. Brown: Yes.
Mr. Mary: You said that there were some hand gestures.
Ms. Brown: Right.
Mr. Mary: Describe those hand gestures.
Ms. Brown: It was like they was arguing over something. I really can't describe, but, you know, when people talking, they move their hands. So I don't know.
Mr. Mary: Who was moving their hands?
Ms. Brown: Both of them.
Mr. Mary: Was it like this (indicating), "We're gonna fight," or 
[Defense successfully objects to state's leading question.]
Mr. Mary: Describe them. What did it appear to you?
Ms. Brown: Like if some  like ifa  like if a robbery was taking place.
However, when re-called to testify by the defendant as part of its case-in-chief, Brown qualified why she thought the encounter between the defendant and the *1229 victim looked like an armed robbery. In direct response to the defendant's question on why she had testified earlier that the confrontation appeared to be an armed robbery, Brown stated:
Ms. Brown: After all that took place, it was in the media, the newspaper, hearsay, it was just everywhere.
Mr. Riehlmann: What was in the newspaper?
Ms. Brown: That Shawn Higgins was trying to rob Donald Price of his Ford Explorer.
Mr. Riehlmann: All right. You read that in the newspaper.
Ms. Brown: That was in the newspaper; it was everywhere.
The state subsequently focused the majority of its cross-examination of Brown on the issue of the underlying armed robbery. Brown reiterated that she could not hear the conversation, nor the tone of the conversation, between the defendant and the victim on the night in question. However, Brown restated her belief that the confrontation appeared to be a robbery because of parties' hand gestures. When asked to describe the hand gestures, Brown replied that "[i]t was more or less like he was asking him to give him something." She then demonstrated to the jury what she meant. During the demonstration, the following ensued:
Ms. Brown: It was like he just walked up to him and he was like trying  asking him to give him something, like he was actually like  like a robbery was taking place.
Mr. Mary: Okay. And you didn't  did you get  you didn't get that from the newspaper, did you?
Ms. Brown: No.
Mr. Mary: You got that from what you saw.
Ms. Brown: What I saw.
Brown then described and demonstrated to the jury that it appeared to her as if the defendant asked the victim for something, the victim refused to comply with the defendant, and at that time the defendant shot and killed the victim. Neither party presented any further evidence on the armed robbery or attempted armed robbery issue.
Given the above evidence, a rational juror could not have concluded beyond a reasonable doubt that the defendant was guilty of every essential element of the crime of armed robbery because the state had not proven, from direct or circumstantial evidence, that the defendant had taken "anything of value" from the victim to constitute the crime alleged. See State v. Captville, 448 So.2d 676 (La.1984). In fact, the state concedes in its brief to this court that Brown's testimony is insufficient to prove a completed armed robbery. See Rep. Br. at 20. Instead, the state argues Brown's testimony is sufficient to support a reasonable juror's conclusion that the killing took place during an attempted armed robbery, thereby supporting his conviction on charges of first degree murder. However, to support a conviction of attempted armed robbery, the state must prove the defendant, having the specific intent to commit the armed robbery, did or omitted "an act for the purpose of and tending directly toward the accomplishing of his object." See La. R.S. 14:27.
The state's conviction rests on the testimony of Wanda Brown, and a detailed examination of her testimony, in conjunction with the physical evidence, reveals that no rational juror could have found beyond a reasonable doubt that the killing took place during an attempted armed robbery. Brown's testimony regarding the attempted armed robbery is based mostly on her interpretation of the events she witnessed. However, her interpretation of the events is subject to several factors which reduce the reasonableness of her conclusions and perceptions, namely, the *1230 time between the event and her initial statement to police, the influence of local media coverage, and the intoxicated state she was in at the time of her observations.
In fact, some discrepancies exist in Brown's own testimony regarding why she thought the perpetrator was attempting to rob the victim at the time of the shooting. Early in her testimony, she attributed her belief that the killing took place during an attempted armed robbery to "the media, the newspaper, [and] hearsay" that "Shawn Higgins was trying to rob Donald Price of his Ford Explorer" at the time of the murder. However, during the state's cross-examination, Brown attempted to act out the encounter and demonstrate why she believed an attempted armed robbery was taking place. During this demonstration, Brown testified her belief that this was an attempted armed robbery was based upon what she witnessed, primarily the "hand gestures" during the confrontation between the Price and the gunman, and not upon the media coverage.
Consistent, however, with the physical evidence was Brown's testimony that she never saw the gunman try to take anything from the victim nor saw the gunman try to grab anything from the victim. To this extent, her account corresponds with Deputy Moscona's testimony that the victim's belongings, including his wallet and its contents, were found on or under the victim when he died. Accordingly, for all that appears, Brown had little if any factual basis for her belief that the killing took place during the course of an attempted armed robbery aside from that discerned from the post-killing media coverage.
This case is factually similar to State v. Bright, 98-0398 (La.4/11/00), 776 So.2d 1134, in which this court held that the evidence presented at trial constituted a second degree rather than a first degree murder. In Bright, the victim had just collected his winnings from a bar's Super Bowl pool and was returning to his vehicle when he was confronted by two men. Id. at p. 4, 776 So.2d at 1138. The victim's friend heard the victim say "what?", followed by an unintelligible word by the gunman to which the victim responded "[w]hat's up with that?" Id. The gunman then shot the victim who ran towards the rear of his vehicle and stumbled back into the bar and later died. Id. Both the gunman and his accomplice immediately fled in the opposite direction. Id. When emergency personnel responded to the scene, they could not locate one of the two envelopes containing $500 of the victim's football pool winnings. Id. at p. 6, 776 So.2d at 1139.
The state argued in Bright that the assailants shot and killed the victim in an attempt to take his football pool winnings. Id. at p. 11, 776 So.2d at 1141. However, this court held that the above scenario constituted a second degree rather than a first degree murder. Id. at p. 14-15, 776 So.2d at 1143. Specifically, this court found no evidence that the defendant in that case knew of the victim's winnings, no evidence that the assailants made a demand for the victim's winnings or anything else of value, no evidence that the victim attempted to resist or flee, no evidence that the assailants attempted to pursue or reach for the wounded victim, and insufficient evidence to distinguish the killing from one "animated by personal grudge or vendetta." Id. at p. 12-14, 776 So.2d at 1142-43. This court concluded that the evidence introduced by the State necessitated the jurors "to speculate" as to the motivation of the attack on the victim; thus the conviction for first degree murder could not sufficiently stand on the evidence presented at trial because "`the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt.'" Id. at 15, 776 So.2d at 1143 (quoting Mussall, 523 So.2d 1305, 1311).
*1231 In the instant case, the state points to Brown's testimony that a heated discussion took place before the killing in an attempt to distinguish Bright. However, while it appears that the length of the interaction in the instant case may have been longer than that of the three or four sentences exchanged in Bright, during her testimony Brown never explicitly stated how long the confrontation between the victim and gunman lasted. Therefore, although the state attempts to characterize the discussion in the instant case as the victim's attempt to resist the armed robbery, such a characterization appears to be mere conjecture since Brown could not hear the words or tone of the exchange. Thus, Brown's testimony, even without considering her alcohol consumption on the night in question, is not sufficient to constitute proof beyond a reasonable doubt with regards to the charge of attempted armed robbery, especially in light of the ambivalent and equivocal nature of her testimony regarding her observations and interpretation of the confrontation she witnessed that night.
Further, like in Bright, the state in the instant case presented no evidence that the gunman attempted to pursue or reach for the wounded victim, and presented insufficient evidence to distinguish the killing from one animated by personal grudge or vendetta. In fact, the victim in the instant case, unlike the victim in Bright, appeared to have all of his possessions intact when police arrived. Accordingly, as in Bright, the state presented insufficient evidence of an attempted armed robbery.
While Brown appears to have reached the above determination that an attempted armed robbery was taking place long after witnessing the shooting, and then only after her exposure to media coverage, her identification of the defendant as the assailant in the instant case is more credible and does not suffer from the same shortcomings as her credibility regarding her interpretation of the confrontation between the defendant and victim on the night in question. Primarily, unlike her uncorroborated statements regarding what appeared to be an armed robbery, Brown's identification of the defendant is substantiated by physical evidence, particularly the DNA evidence which, through expert testimony, linked the defendant by trace samples of blood to the bandana stashed with the murder weapon in Ruby Wells's backyard. This evidence also bolsters Brown's explicit rejection of defense counsel's suggestion that a shorter man, namely Melvin Jenkins, was the perpetrator.
Furthermore, at trial Brown gave the following testimony regarding her identification of the defendant:
Mr. Mary: How long did you look at it before you picked out number two [from the line-up]?
Ms. Brown: Instantly.
Mr. Mary: And the person in number two is that man right there (indicating).
Ms. Brown: Yes.
Mr. Mary: And, Wanda, let me ask you this. You're witnessing these events; you've been drinking, right?
Ms. Brown: Yes.
Mr. Mary: Are you sure that that's the man that killed Donald Price?
Ms. Brown: I'm positive.
Brown's testimony points to her genuine belief in her identification of the defendant as the man she saw shoot Price. Further, Brown attested that despite her inebriated state at the time of the shooting, she was certain in her identification of the defendant as the shooter. Further, there is no indication that her identification of the defendant as the perpetrator was tainted by any media reports,[6] unlike her conclusion *1232 that the defendant was attempting an armed robbery at the time of the shooting which she admitted was influence by the newspaper and television reports. Therefore, despite the aforementioned inconsistences in Brown's testimony with the physical evidence, which were likely the result of her alcohol consumption and which negated the credibility of her interpretation of events and the confrontation between the defendant and victim, it appears that the jury rationally accepted Brown's identification of the defendant, in part, because it was not tainted by media representations, and also since her identification was bolstered by the physical evidence.
Thus, while the defendant contests both of the above credibility determinations of the jury, for the reasons set out above, one such determination was rational and one was not. The trier of fact makes credibility determinations and may, within the bounds of rationality, accept or reject the testimony of any witness; thus, a reviewing court may impinge on the fact finder's discretion "only to the extent necessary to guarantee the fundamental protection of due process of law." Mussall, 523 So.2d at 1310. The due process standard of review under Jackson, 443 U.S. at 319, 99 S.Ct. at 2789, does not sanction juror speculation if the evidence is such that a reasonable factfinder must have a reasonable doubt. State v. Lubrano, 563 So.2d 847, 850 (La.1990).
In this case a rational trier, viewing the evidence in the light most favorable to the state, could only speculate whether there was an attempted armed robbery at the time of the shooting. The evidence at trial, therefore, failed to establish every element of the charged offense and cannot support defendant's conviction for first degree murder.
However, under State v. Byrd, 385 So.2d 248 (La.1980), and La.Code Crim. Proc. art. 821(E), discharge of the defendant is neither necessary nor proper when the evidence presented at trial does not support the verdict returned but does support a responsive verdict or lesser included grade of the offense. Bright at p. 15, 776 So.2d at 1144; State v. Hart, 96-0697, pp. 16-17 (La.3/7/97), 691 So.2d 651, 661-62. Because we find that the evidence subjected to the Jackson standard supports a conviction for specific intent second degree murder as provided in La. R.S. 14:30.1(A)(1), which is responsive to a charge of first degree murder, we vacate the defendant's conviction for first degree murder and sentence of death. Since, as will be seen hereinafter, we find no other meritorious assignments of error, we modify the judgment of guilty of first degree murder, render a judgment of guilty of second degree murder, and remand the case to the district court for sentencing on the modified judgment as set forth in La. R.S. 14:30.1(B).

Suppression of Witness Identification
The defendant claims that the trial court erroneously denied his motion to suppress, as police used a suggestive identification procedure to coerce Wanda Brown into identifying the defendant as the perpetrator.
As a general matter, the defendant has the burden of proof on a motion to suppress an out-of-court identification. La.Code Crim. Proc. art. 703(D). To suppress an identification, a defendant must first prove that the identification procedure was suggestive. State v. Prudholm, 446 So.2d 729, 738 (La.1984). An identification procedure is suggestive if, *1233 during the procedure, the witness's attention is unduly focused on the defendant. State v. Robinson, 386 So.2d 1374, 1377 (La.1980). However, even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show that there was a substantial likelihood of misidentification as a result of the identification procedure. Prudholm, 446 So.2d at 738.
The Supreme Court held in Manson v. Brathwaite, 432 U.S. 98, 116, 97 S.Ct. 2243, 2254, 53 L.Ed.2d 140 (1977), that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors which courts must examine to determine, from the totality of the circumstances, whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness' opportunity to view the criminal at the time of the crime; 2) the witness' degree of attention; 3) the accuracy of his prior description of the criminal; 4) the level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114-15, 97 S.Ct. at 2254.
In the instant case, appellate counsel points out that Brown met with a detective for at least an hour before she identified the defendant. Although police subsequently memorialized Brown's identification of the defendant by obtaining an audiotaped statement, they did so 18 minutes after her initial identification, and over an hour-and-a-quarter after the beginning of her interview. The defendant also points out that the detective conducting the interview indicated to Brown that the suspected perpetrator would be in one of the photo arrays. However, at the suppression hearing, Brown testified that the detective at issue did not tell her which photo to choose, and that she identified the defendant on her own. Likewise, the detective who conducted the identification testified that he did not inform Brown which photo to pick, and that Brown chose the defendant's photo of her own free will without any of his guidance. Upon the trial court's review of the lineup, she found it "appropriately compiled." The court went on deny the motion to suppress, after issuing the following findings:
[The lineup] was all black males of approximately the same age, approximately the same hairstyle. They all have moustaches, and there's nothing distinguishing about any of them that would make one pick out one over the other. I also believe that it was presented to Ms. Brown in an appropriate fashion. She indicated she was not forced, coerced or told which one to pick. She wrote on the back [of the array] that number two [killed the victim], and the officer also indicated that he did force, coerce, [or] promise anything to her.
Given the above, the trial court has made a finding of fact based on testimony and an evaluation of credibility. Specifically, the trial court found credible the testimony that Brown was not forced, coerced, or told which photo to choose. In these circumstances, a reviewing court owes that determination great deference and may not overturn it in the absence of manifest error. See, e.g., State v. Bourque, 622 So.2d 198, 222 (La.1993) (a "trial judge's ruling [on a fact question], based on conclusions of credibility and weight of the testimony, is entitled to great deference and will not be disturbed on appeal unless there is no evidence to support the ruling."). Accordingly, the defendant has not shown that police conducted a suggestive identification, and this claim fails.

*1234 Opinion Testimony of Wanda Brown

The defendant urges that the trial court erred in allowing opinion testimony of lay-witness Wanda Brown. Specifically, he contends that Brown should not have been allowed to testify that it appeared to her that "a robbery was taking place."
As a general matter, La. C.E. art. 701 permits the court to allow opinion testimony by a lay witness when the opinion is rationally based on the perception of the witness and is helpful to a clear understanding of her testimony or to the determination of a fact in issue. Furthermore, a witness may testify to a matter based on personal knowledge. La. C.E. art. 602. Moreover, "[t]estimony in the form of an opinion or inference otherwise admissible is not to be excluded solely because it embraces an ultimate issue to be decided by the trier of fact." La. C.E. art. 704.
In the instant case, Brown testified that she was approximately four to six feet from the men, and that she and the two men stood in a sort of triangle. Brown further stated that she personally observed the defendant and the victim engaged in a heated discussion, and exchanging hand gestures. Brown testified that she watched as the pair "appeared to be having an argument." Accordingly, Brown's observation that a robbery was taking place may have been rationally based on her perception, as well as the perception of any layperson, of the interaction between the defendant and the victim. If this is the case, the trial court did not abuse its broad discretion in admitting the evidence. See State v. Vanderhoff, 415 So.2d 190, 194 (La.1982) ("While it is true that a lay witness, generally, can testify only as to facts, a witness is permitted to draw reasonable inferences from personal observation."). However, the credibility and reliability of such testimony, once admitted, was still within the province of the reasonable juror.

Admissibility of Wanda Brown's Out of Court Statement Regarding Coercion
As an assignment of error, the defendant claims that the trial court prevented him from establishing that the state coerced Wanda Brown into identifying him as the perpetrator when it ruled inadmissible an out of court statement prepared by defense investigators and signed by Brown. Specifically, Brown testified at trial that she has consistently and repeatedly told anyone who asked that she could not describe the clothing worn by the perpetrator of the shooting. Defense counsel then asked Brown:
But despite your persistent telling Mr. Mary `I can't remember what the clothes were,' Mr. Mary tried to get you to say, don't you remember a plaid shirt being worn by the gunman, didn't he?
Brown responded that the prosecutor never told her that the gunman wore a plaid shirt. Defense counsel then read to Brown a portion from a statement prepared by defense investigators and adopted and signed by Brown. In the statement, Brown averred that the prosecutor had "asked me if the shooter was wearing a plaid shirt after I have consistently said that I cannot remember details about the clothing." The state objected, and the court ruled Brown's statement inadmissable hearsay. The defendant asked Brown whether any prosecutors had attempted to tell her what clothes the perpetrator was wearing, she responded negatively, and defense counsel again attempted to "impeach" Brown using her earlier signed document. While the defendant apparently does not contest the fact that the statement in question constitutes hearsay, he claims that the trial court should have allowed it nonetheless, and thus afforded him his right to present a defense.
*1235 As a general matter, this Court has recognized that under compelling circumstances a defendant's right to present a defense may require admission of statements which do not fall under any statutorily recognized exception to the hearsay rule. See State v. Van Winkle, 94-0947, p. 7 (La.6/30/95), 658 So.2d 198, 202 (finding reversible error to exclude hearsay evidence suggesting that defendant's roommate killed victim); State v. Gremillion, 542 So.2d 1074, 1078 (La.1989) ("While the statement does not fit into any of the recognized exceptions to the hearsay rule, it should have, nevertheless, been admitted into evidence due to its reliability and trustworthy nature."); see also Chambers v. Mississippi, 410 U.S. 284, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973) (holding that the strict application of state hearsay rules denied the defendant his due process right to present a third party confession made under circumstances which vouched for the trustworthiness of the statement).
In this case, however, defendant points to no circumstances which vouched for the reliability and trustworthiness of Brown's earlier "statement" as it was admittedly written by a defense investigator. Further, even assuming Brown's signature somehow renders the statement sufficiently reliable, and thus further assuming trial court error, police found the defendant's blood on a bandana hidden next to the murder weapon, in an area where the perpetrator was known to have fled. Thus, any error which might have excluded an oblique suggestion that a prosecutor attempted unsuccessfully to influence a witness was harmless since it was not necessary to link the defendant to the plaid shirt because DNA evidence linked him to the other item of clothing found with the murder weapon. See, Chapman v. California, 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

Denial of Cause Challenges
In this assignment of error, the defendant contends that it was error for the trial court to deny the defense challenges for cause as to two prospective jurors, Mr. Hill and Mr. White.
As an initial matter, although the defendant raises complaints about the trial court's initial refusal to grant his cause challenge of potential juror Hill, an examination of the record reveals that Hill was eventually removed for cause, after the trial court learned that his cousin had been kidnapped, raped, and murdered. Since only an erroneous ruling of a trial judge which deprives a defendant of one of his peremptory challenges constitutes a substantial violation of a constitutional and statutory right which requires reversal of his conviction and sentence, even assuming that the trial court may have erred in denying the defendant's initial challenge for cause, the trial judge's subsequent ruling excusing Hill corrected any error and renders the issue moot since any error in this ruling did not deprive the defendant of any of his peremptory challenges. See State v. Jacob, 99-1659, p. 5 (La.6/29/01), 789 So.2d 1280, 1284.
As to potential juror White, generally, prejudice is presumed when a challenge for cause is denied erroneously and the defense exhausts all of its peremptory challenges. State v. Howard, 98-0064, pp. 7-9 (La.4/23/99), 751 So.2d 783, 794-95; State v. Robertson, 92-2660, pp. 2-3 (La.1/14/94), 630 So.2d 1278, 1280-81. An erroneous ruling depriving an accused of a peremptory strike violates his substantial rights and constitutes reversible error. See Jacob at p. 5, 789 So.2d at 1284; State v. Hart, 96-0697, p. 7 (La.3/7/97), 691 So.2d 651, 656; State v. Ross, 623 So.2d 643, 644 (La.1993); State v. Bourque, 622 So.2d 198, 225 (La.1993).
*1236 The defendant in the present case exhausted all of his peremptory challenges. Thus, at issue is whether the defendant's challenge for cause as to potential juror White, based on his alleged predisposition to impose the death penalty, should have been sustained by the trial judge. La.Code Crim. Proc. art. 797 sets forth several grounds for which a juror may be challenged for cause, such as when a juror is not impartial, "whatever the cause of his partiality," and when a juror "will not accept the law as given to him by the court." The court vests the trial judge with broad discretion in ruling on challenges for cause, and will only reverse such rulings when a review of the entire voir dire reveals the judge abused his discretion. State v. Ball, 00-2277, p. 11 (La.1/25/02), 824 So.2d 1089, 1102; Robertson at p. 3, 630 So.2d at 1281.
The trial judge should grant a challenge for cause, even when a prospective juror declares his ability to remain impartial, if facts revealed from the juror's responses as a whole reasonably imply bias, prejudice or the inability to render a judgment according to the law. Ball at p. 12, 824 So.2d at 1102 (quoting State v. Hallal, 557 So.2d 1388, 1389-90 (La.1990)). However, a refusal to disqualify a venireman on grounds he is biased does not constitute reversible error or an abuse of discretion if, after further examination or rehabilitation, the juror demonstrates a willingness and ability to decide the case fairly according to the law and evidence. Howard at pp. 7-10, 751 So.2d at 795-797; Robertson, 630 So.2d at 1281. The proper standard for determining when a prospective juror should be excluded for cause because of his view on capital punishment is whether those views prevent or substantially impair the performance of his duties as a juror. Witherspoon v. Illinois, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776 (1968) (holding that a prospective juror who would automatically vote to impose a life sentence is properly excluded for the jury); see also Wainwright v. Witt, 469 U.S. 412, 424, 105 S.Ct. 844, 852, 83 L.Ed.2d 841 (1985). The "substantial impairment" standard applies both to those who would vote automatically against capital punishment, see Witherspoon, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 776, as well as those who would vote automatically for capital punishment and is unable to consider a life sentence under the facts of the particular case, also known as a "reverse-Witherspoon." State v. Divers, 94-0756, p. 8 (La.9/5/96), 681 So.2d 320, 324 n. 5 (citing Morgan v. Illinois, 504 U.S. 719, 112 S.Ct. 2222, 119 L.Ed.2d 492 (1992)). Jurors who cannot consider both a life and death sentence are "not impartial," and cannot "accept the law as given ... by the court." La.Code Crim. Proc. art. 797(2), (4); State v. Maxie, 93-2158, p. 16 (La.4/10/95), 653 So.2d 526, 534-35. Thus, a trial judge's failure to disqualify a potential juror unable to consider as proper penalties both a sentence of life and death constitutes reversible error. Jacobs at p. 6, 789 So.2d at 1285; Divers at pp. 8-13, 681 So.2d at 324-27.
In the instant case, defendant argues that prospective juror White should have been excused for cause because he was predisposed to impose the death penalty. At the beginning of White's examination, he stated that he would wait and listen to all the evidence before making a decision as to the appropriate penalty. Further, when asked if he would automatically impose the death penalty, White responded that he would not. After the state outlined the facts of a generic first degree murder, White again reiterated that he would not make a decision regarding the penalty and "would stay down the middle" until all evidence was presented. White indicated that he would follow the law as instructed by the court regarding the imposition of sentence during the penalty *1237 phase of the trial and would consider all the evidence the court instructed him to consider.
During the defendant's examination of potential juror White, his answers became a bit more detailed as counsel's questions became more intricate and specific. The following line of questioning ensued:
Mr. Riehlmann: If you were selected and you served on this jury and you heard the testimony of the witnesses and they convinced you beyond a reasonable doubt that Shawn Higgins killed Donald Price during the course of an armed robbery, and that he did it intentionally  it was no accident, there was no heat of blood or self-defense, he killed him intentionally during the course of an armed robbery, Mr. White, do you think that the only appropriate penalty is the death penalty?
Mr. White: Yes.
Mr. Riehlmann: If you were at that point, you were convinced, in the penalty phase, would you give any serious consideration to a life sentence?
Mr. White: To be honest, I would have to weigh the evidence that was presented to me in the penalty phase and there would be a possibility 
Mr. Riehlmann: Of a life sentence?
Mr. White:  of a life sentence, if the evidence was presented to me was such that it would dictate that.
Further, White indicated that he would "probably not" be able to consider a life sentence if the defendant had killed a small child, or if he had killed many people, and he would not be able to consider a life sentence for proven mass murderers such as Osama bin Laden. Defense counsel then pointed out that on a voir dire potential juror questionnaire, White circled the statement: "In a case in which the defendant is convicted of first degree murder and in which the death penalty is requested, I will always vote to impose the death penalty." When asked about the above response, White clarified his position and stated that if the evidence presented to him indicated that the death penalty was not the proper sentence, he would have "no problem going with the life sentence;" however, he did indicate that he would have difficulty in deciding that a person with other convictions for shootings should not get the death penalty.
White also stated that the defendant would have to prove to him "beyond a doubt, beyond a shadow of a doubt" that a hypothetical defendant proven guilty of murder with other murder convictions should not get the death penalty. He further explained:
Well, I believe in the court system, it's your job to prove to me why the client should not get a certain penalty, just like with the District Attorney, it's his position to prove that the death penalty is what he should receive.
Defense counsel then asked White whether he would still be able to consider a life sentence if the state were to put on evidence of aggravating circumstances, but the defense chose not to present any evidence regarding mitigating circumstances, to which White responded he could not consider a life sentence in such a circumstance.
Over defense counsel's objection, the trial court denied the defense challenge for cause, because, when looking at the whole voir dire, the trial court thought White "could be fair." The defendant subsequently exercised a peremptory challenge to remove White.
Since the reviewing court is charged with determining whether the trial judge's denial of a defense challenge for cause was an abuse of the trial court's broad discretion, the reviewing court *1238 should scrutinize the entire voir dire record as a whole. State v. Cross, 93-1189, pp. 6-7 (La.6/30/95), 658 So.2d 683, 686-87. Upon a review of White's responses during the entire voir dire, we find no abuse of the trial judge's discretion in refusing to grant the defendant's challenge for cause. White responded to the state's questioning that he would listen and consider both the aggravating and mitigating circumstances and in an appropriate case return a life sentence. Later, when questioned by defense counsel, White indicated there were some situations in which he would "probably not" be able to consider a life sentence. However, when asked by defense counsel if he would consider mitigating circumstances, as required by law, White replied he would. Nevertheless, White indicated that in the absence of mitigating circumstances, he would be unable to impose a life sentence in certain circumstances. Defendant argues that such statements indicate White was substantially impaired in his ability to perform his duties as a juror in accordance with his instructions and oath in regards to the penalty phase of the trial, and therefore, should have been removed for cause. However, a defendant does not begin the penalty phase of a capital case with a presumption that either a death or a life sentence is the proper punishment. State v. Lucky, 96-1687, p. 6 (La.4/13/99), 755 So.2d 845, 850. Louisiana law does not provide any standard for a juror to weigh mitigating circumstances against aggravating circumstances, but rather simply requires the finding of an enumerated aggravating circumstance by the jury to impose the death penalty and also requires that each juror consider any mitigating circumstances presented, if any, by the defense before deciding to recommend a sentence of death. Id.; see also State v. Strickland, 94-0025, pp. 48-49 (La.11/1/96), 683 So.2d 218, 238; La.Code Crim. Proc. art. 905.3. Thus, White's statement regarding his requirement of mitigating circumstances for a consideration of a life sentence does not offend the law. While Louisiana law requires the consideration of mitigating circumstances by the jury when presented to them during the trial, it does not require the jurors to consider a life sentence if no mitigating circumstances are offered by the parties in regards to sentencing. See Lucky at pp. 6-7, 755 So.2d at 850.
Furthermore, this court has stated that personal predispositions of potential jurors "do not offend the law, provided that they do not `substantially impair' the juror's duty to follow the law." Lucky at p. 7, 755 So.2d at 850. Jurors often have their own predispositions or leanings in favor of a particular penalty, and not every predisposition rises to the level of substantial impairment, and the critical determination of whether such predisposition constitutes substantial impairment is within the providence of the trial judge's discretion. Id. In State v. Lucky, this court recognized that:
[w]hen the trial judge throughout the voir dire demonstrates an awareness of the proper legal standard, and when there is nothing in the record of the voir dire that, taken as a whole, shows a substantial impairment of the prospective juror, a reviewing court should defer to the trial judge's determination with respect to challenges for cause. While the reviewing court must carefully review the record of voir dire for abuses of discretion, it need not and should not attempt to reconstruct the voir dire by a microscopic dissection of the transcript in search of magic words or phrases that automatically signify either qualification or disqualification.
Id. at pp. 7-8, 755 So.2d 850-51.
In the instant case, the trial judge perceived the whole of White's responses to *1239 mean that he could be fair and would look at all evidence presented, including any mitigating evidence, prior to imposition of sentence. Although potential juror White indicated in certain circumstances it would be difficult to impose a life sentence over capital punishment, with exception to the mass murderer scenario, he never indicated that he would not consider the imposition of both life and death and follow the letter of the law as required by his oath and duty. On this record of the voir dire, taken as a whole, we cannot say the trial judge abused his discretion in making the determination that White could be fair.
Furthermore, neither the court, the prosecutor, nor the defense counsel found it necessary to rehabilitate potential juror White after defense counsel elicited the responses in question. In fact, the prosecutor even asked defense counsel during a bench conference whether or not he had asked White if his "leaning" towards the death penalty would substantially impair his ability to follow the law, to which defense counsel answered no. Both the state and the trial court seemed confident that White could follow the law as instructed, and the lack of an attempt at additional rehabilitation does not appear to be an abuse of the trial judge's discretion. See Ball at p. 23, 824 So.2d at 1110.
In addition, we question the propriety of defense counsel's questioning of potential juror White in regards to the presentation of mitigating circumstances. White had already answered that he would consider any mitigating evidence presented during the penalty phase when defense counsel asked White about the imposition of a life sentence absent the presentation of any mitigating circumstances. Defense counsel seems to be suggesting that the same burden of proof which exists during the guilt phase, also exists during the penalty phase, specifically that the state must prove the defendant does not deserve a life sentence, but rather a sentence of death. However, this suggestion is contrary to Louisiana law which does not provide any standard for a juror to weight mitigating circumstances against aggravating circumstances. Lucky at p. 6, 755 So.2d at 850. The state merely has to prove the existence of one aggravating circumstance beyond a reasonable doubt to impose a death sentence, while the jury must then only consider any mitigating circumstances presented to it. La.Code Crim. Proc. art. 905.3. Thus, it appears that defense counsel's question may have actually been misleading to the juror regarding the standard for sentencing, and therefore should not have played a large factor in the trial court's determination of the juror's ability to follow the law.
Hence, for the aforementioned reasons, the trial judge did not abuse her wide discretion in determining that prospective juror White could be impartial and follow the duties and instructions of a juror.

Denial of Expert Misidentification Testimony
In his third assignment of error, the defendant claims the trial court erred in refusing to allow expert testimony concerning the causes of misidentification. Specifically, this testimony was to be offered in order to diminish the credibility of eyewitness Wanda Brown.
As a general matter, under La.C.E. art. 702, "if scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify . . . in the form of an opinion or otherwise." In reviewing an expert's qualifications, the "trial judge is vested with wide discretion in determining the competence of an expert witness. Competence of an expert witness is a question of fact to be *1240 determined within the sound discretion of the trial judge; h[er] rulings on the qualifications of expert witnesses will not be disturbed in the absence of manifest error." State v. Stucke, 419 So.2d 939, 944 (La.1982)(citing State v. Drew, 360 So.2d 500 (La.1978)).
Under Stucke and its progeny, a trial court may exclude expert testimony regarding the reliability of eyewitness identification. Stucke, 419 So.2d at 945; see also State v. Ford, 608 So.2d 1058, 1060-1061 (La.App. 1st Cir.1992); State v. Velez, 588 So.2d 116, 134 (La.App. 3 Cir.1991). Because of the risk that expert testimony on eyewitness identification "will have a greater influence on the jury than other evidence presented at trial," and because such evidence presents the danger of "`invad[ing] the field of common knowledge, experience, and education of men[ ]'" this Court has held that the prejudicial impact of such evidence would substantially outweigh its probative value. Stucke, 419 So.2d at 945 (quoting 3 Am.Jur.2d, Expert and Opinion Evidence, § 21; 100 A.L.R.2d 1421, 92 A.L.R. 1223).
In the instant case, the defendant wished to call Dr. John C. Brigham, an expert in eyewitness identification, who would have testified regarding his findings after years of studying the reliability of eyewitness testimony.[7] Specifically, Brigham sought to explain to the jury his findings that, inter alia, intoxication greatly increases the likelihood of false identification, that little correlation exists between the confidence expressed by an eyewitness and the actual reliability of that witness's identification, that the chance of misidentification increases with the length of time between incident and identification, and that facts gathered from secondary sources after observing the event in question tend to skew a witness's perception of that event. While the defendant claims that the particular facts of this case present the rare instance in which the" `specialized knowledge' of an expert in the form of opinion evidence would assist the jury in deciding the question of identity," Stucke, 419 So.2d at 951 (Lemmon, J., concurring), with the possible exception of the effect of alcohol on Brown's ability to process the world around her, the proposed expert testimony likely presented an invasion into a reasonable juror's common knowledge. See State v. Ammons, 208 Neb. 797, 305 N.W.2d 812, 814 (1981) (the prejudicial effect of a psychologist's testimony on a witness's identification outweighs its probative value); see also Ford, 608 So.2d at 1061 (expert testimony regarding the fallibility of human perception and memory generally is unnecessary to resolve the issues regarding the reliability of an identification); see generally Elizabeth Loftus, Eyewitness Testimony Civil and Criminal (1997). The trial court thus properly excluded this expert testimony, and defendant's third assignment of error fails to have merit.

Brady Violation
The defendant next claims that prosecutors violated the rule of Brady v. Maryland, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963) when they failed to disclose Melvin Jenkins's grand jury testimony. According to the defendant, Jenkins likely testified to the grand jury that Wanda Brown was not present at the *1241 scene of the shooting. The defendant thus could have used such testimony to impeach Brown's claim that she witnessed the killing.
As a general matter, a defendant is not entitled to production of a transcript of a secret grand jury proceeding against him, even for use at trial in conducting cross-examination. La.Code Crim. Proc. art. 434; State v. Peters, 406 So.2d 189, 190-91 (La.1981). The purpose of this rule is not to protect a defendant or witness at a subsequent trial, but to encourage the full disclosure of information about crime. Id; see also State v. Ivy, 307 So.2d 587 (La.1975). However, the rule of secrecy is not absolute. In some situations justice may require that discrete segments of grand jury transcripts be divulged for use in subsequent proceedings. State v. Trosclair, 443 So.2d 1098, 1102-03 (La.1983) (citing Douglas Oil Co. v. Petrol Stops Nw, 441 U.S. 211, 99 S.Ct. 1667, 60 L.Ed.2d 156 (1979)). Thus a trial court may act upon a specific request stated with particularity and review grand jury transcripts in camera to determine if information contained therein is favorable to the accused and material to guilt or punishment. Trosclair, 443 So.2d at 1103; Peters, 406 So.2d at 191.
The party seeking disclosure bears the burden to show a compelling necessity for breaking the indispensable secrecy of grand jury proceedings. He must show that, without the material, his case would be greatly prejudiced or that an injustice would be done. Trosclair, 443 So.2d at 1103 (citing United States v. Procter & Gamble Co., 356 U.S. 677, 78 S.Ct. 983, 2 L.Ed.2d 1077 (1958)); State v. Ates, 418 So.2d 1326, 1328-29 (La.1982). If allowed, disclosure "must be closely confined to the limited portion of the material for which there is particularized need." Trosclair, 443 So.2d at 1103. In any event, disclosure is left to the sound discretion of the trial court whose ruling will not be reversed absent an abuse of that discretion. Id.
In the instant case, a review of Jenkins's sealed testimony reveals that it does not contain any exculpatory evidence. Instead, Jenkins delivers only a quick, bare-bones account of his exploits with the defendant on the night in question, without describing the particulars of the occurrence, such as the exact street location or who may or may not have been in the area. Sealed Jenkins Tr. at 2-3. Accordingly, Jenkins's sealed testimony not only fails to shed light on the veracity of Brown's testimony, it contained a substantial amount of testimony incriminating the defendant for his role in the killing. The trial court thus did not abuse its discretion in refusing to order such testimony disclosed and the prosecutors failure to disclose this grand jury testimony did not violate Brady. Trosclair, 443 So.2d at 1103; Peters, 406 So.2d at 191.

CONCLUSION
The defendant's conviction and death sentence for the first degree murder of Donald Price are set aside. The jury's verdict of guilty of first degree murder is modified and we render a judgment of guilty of second degree murder. The case is remanded to the trial court for sentencing on the modified judgment of second degree murder.

DECREE
For the reasons assigned herein, we set aside the defendant's first degree murder conviction and death sentence. We hereby modify the jury's verdict of guilty of first degree murder and render a judgment of guilty of second degree murder. La.Code Crim. Proc. art. 821(E). We remand the case to the trial court for sentencing of the defendant on the modified judgment to *1242 serve life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence as provided for in La. R.S. 14:30.1(B).
CONVICTION OF FIRST DECREE MURDER AND DEATH SENTENCE SET ASIDE; JUDGMENT OF GUILTY OF SECOND DEGREE MURDER RENDERED; REMANDED TO THE TRIAL COURT FOR SENTENCING OF DEFENDANT TO LIFE IMPRISONMENT AT HARD LABOR WITHOUT BENEFIT OF PAROLE, PROBATION, OR SUSPENSION OF SENTENCE.
JOHNSON, J., dissents and assigns reasons.
TRAYLOR, J., dissents and assigns reasons.
JOHNSON, J., dissenting:
Defendant Shawn Higgins was convicted of first degree murder and sentenced to death based largely upon the testimony of the State's witness, Wanda Brown. In vacating defendant's first degree murder conviction and death sentence in favor of the lesser included charge of second degree murder, the majority suggests that Brown's identification of Higgins as the perpetrator of this crime is reliable, while conceding that her testimony with regard to whether an armed robbery took place is not. In my view, Ms. Brown's testimony was riddled with contradictions, inconsistencies, and inexplicable non sequiturs which completely nullify the credibility and reliability of her identification of Higgins as the shooter. It is nonsensical to rely upon this witness's testimony for one purpose but not for the other.
The majority has acknowledged that Brown was highly intoxicated at the time of the shooting, and that her status as a diabetic left her highly susceptible to the effects of alcohol. Brown admitted to having consumed twelve beers and between eight to ten rum and cokes prior to witnessing Price's murder. Brown did not come forward to identify Higgins as Price's murderer until more than a year after the crime occurred. Further, Brown admitted that her perception that the gunman was attempting to commit an armed robbery was influenced by local media coverage.
The veracity of Ms. Brown's identification is further undermined by her internally inconsistent testimony. Brown testified that before the shooting she followed the victim out of the West Bank Lounge, walking "a few feet" behind him as the two made a right down the West Bank Expressway, walked down that block, made a right down Cross Street, and finally walked more than fifty feet before Price was accosted by a lone gunman. This testimony is contradicted by evidence submitted to the jury which indicates that Price did not have sufficient time to leave Boomtown Casino, drive to the Westbank Lounge, enter the Lounge, and then leave the Lounge and return to his vehicle. Photographs taken at the crime scene are consistent with the victim walking away from his vehicle, rather than toward it.
In addition, Brown testified that during the shooting she was standing a mere five to six feet away from Price and Higgins, yet she was unable to describe the gunman's height, weight, or clothing. Further, although Brown testified to standing in close proximity to the two men, in sufficient light to see Higgins' face; incredibly, neither of the two men acknowledged her presence. Finally, although testifying that she "instantly got sober" at the moment of the shooting, Brown made the implausible claim that she returned to the Lounge and informed patrons that a man had just been killed and requested "a moment of meditation" in honor of the slain victim. Deputy Moscona testified that he "turned up nothing" in interviews with patrons with *1243 regard to Brown's alleged request, which clearly undermines her claims of instant sobriety.
I am well aware that in the absence of internal contradiction or irreconcilable conflict with the physical evidence, one witness's testimony, if believed by the trier of fact, is sufficient to support a factual conclusion. State v. Robinson, 02-1869, p. 16 (La.4/14/04), 874 So.2d 66, 79. While the trier of fact in a criminal case is afforded deference in making credibility determinations regarding witness testimony, this deference is limited by the bounds of rationality. State v. Mussall, 523 So.2d 1305, 1310 (La.1988). While "the court is not to substitute its judgment of what the verdict should be for that of the jury, . . . at the same time the jury cannot be permitted to speculate if the evidence is such that reasonable jurors must have a reasonable doubt." Mussall, 523 So.2d at 1311. Faced with such far-fetched, inconceivable testimony, I find it incredulous that any rational jury could come to the conclusion that Brown's identification of Higgins as the shooter was reliable; therefore, I do not believe that it is appropriate to find the evidence sufficient to support the lesser included offense of second degree murder.
On the other hand, the only other witness to this crime was Ruby Wells, who was inside her home when she heard gunshots. Ms. Wells testified that she observed a man running along her fence into her neighbor's yard from her window. This man jumped over her fence onto her property and then ran toward her back yard. The murder weapon, along with a bandana and other evidence was ultimately discovered hidden on Ms. Wells' property. Unlike Brown, Ms. Wells immediately called the authorities and cooperated with their investigation attempts. At trial, she was adamant that the person that she observed was very short in stature with a dark complexion, which is inconsistent with a physical description of Higgins.
Further, the only physical evidence linking Higgins to this murder comes in the form of a black bandana found with the murder weapon. The State explained the presence of Higgins' blood on the bandana by suggesting that he injured himself climbing the chain link fence bordering Ms. Wells' home. While a small hole discovered in the right glove allegedly supports this theory of the case; defendant's DNA was never recovered from either the fence or the glove. In my view, the presence of Higgins' DNA on the bandana proves no more than that he used this bandana at some point in time.
I am of the opinion that no rational trier of fact viewing all of the evidence in a light favorable to the prosecution could have found sufficient evidence of Higgins' guilt beyond a reasonable doubt, and therefore, constitutionally, this conviction cannot stand. Mussall, 523 So.2d at 1309-10. Therefore, I respectfully dissent from the majority determination that the evidence presented at trial was sufficient to prove beyond a reasonable doubt that Higgins was the perpetrator of this crime.
TRAYLOR, Justice, dissenting.
I dissent from the majority's decision to modify the jury's verdict of guilty of first degree murder to render a judgment of guilty of second degree murder. If Wanda Brown's observation of the defendant on the night in question is sufficiently reliable to identify the defendant as the perpetrator of this crime, then her observation that an attempted robbery was taking place is likewise sufficiently reliable and serves to support the jury's finding that the offender was engaged in the attempted perpetration *1244 of an armed robbery when he shot and killed the victim.
Therefore, I respectfully dissent
NOTES
[1] It appears Price cashed in winnings totaling $397.15 at the casino, but only $223 was found in his wallet after his murder. Police cannot explain the missing $174.15, however, the state did not present any evidence or argument at trial that the defendant took the missing money.
[2] On February 26, 2000 a Jefferson Parish jury found the defendant guilty of the unrelated second degree murder of Carl Jackson which occurred on the evening of October 25, 1998, approximately 20 hours after the Price murder. For that crime, the trial court subsequently sentenced the defendant to life imprisonment at hard labor without benefit of parole, probation, or suspension of sentence. The defendant then appealed, and the court of appeal affirmed. State v. Higgins, 01-0368 (La.App. 5th Cir.10/17/01), 800 So.2d 918. This Court denied writs. State v. Higgins, 01-3267 (La.11/1/02), 828 So.2d 565.
[3] An earlier pretrial dispute over victim impact evidence also ended up in the court of appeal. State v. Higgins, 01-0117 (La.App. 5th Cir.3/28/01), 802 So.2d 685. The defendant apparently did not seek writs after this ruling.
[4] Those assignments of error briefed, but not argued by defense counsel at oral argument and governed by clearly established principles of law will be addressed in an unpublished appendix to this opinion which will comprise part of the record in this case.
[5] At trial, the state did attempt to present additional evidence to support the underlying armed robbery for the charge of first degree murder in the form of Melvin Jenkins' testimony. Jenkins had testified before the grand jury which indicted the defendant for first degree murder. However, at defendant's trial, but not in front of the jury, Jenkins requested an attorney, and subsequently invoked his Fifth Amendment right against self incrimination. Thus, the only evidence presented to the jury to prove the armed robbery or attempted armed robbery was the testimony of Wanda Brown.
[6] In fact, at the identification suppression hearing, when asked if she had seen the defendant on any other occasion, either before or after the shooting, she answered no. Brown also attested that she had never seen a picture of the defendant in the newspaper or on television.
[7] In one such study, for example, after obtaining permission from bank managers to do so, Brigham arranged for actors to present bank tellers with obviously forged checks and request that the checks be cashed. After the tellers refused, actors argued for approximately 90 seconds and stormed out. Later, when asked by "detectives" to identify the people attempting to cash checks, tellers met with approximately a 48% success rate. App. at 22.