# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 17-220

**STATE OF LOUISIANA**

**VERSUS**

**CHRISTOPHER SHON MACE**

\*\*\*\*\*\*\*\*\*\*

APPEAL FROM THE
FOURTEENTH JUDICIAL DISTRICT COURT
PARISH OF CALCASIEU, NO. 40406-11
HONORABLE DAVID ALEXANDER RITCHIE, DISTRICT JUDGE

\*\*\*\*\*\*\*\*\*\*

## ELIZABETH A. PICKETT
## JUDGE

\*\*\*\*\*\*\*\*\*\*

Court composed of Elizabeth A. Pickett, John E. Conery, and Candyce G. Perret, Judges.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

**John Foster DeRosier**
**Fourteenth Judicial District Court District Attorney**
**Elizabeth Brooks Hollins**
**Carla Sigler**
**Assistant District Attorneys**
**P. O. Box 3206**
**Lake Charles, LA 70602-3206**
**(337) 437-3400**
**COUNSEL FOR PLAINTIFF-APPELLEE:**
        **State of Louisiana**

**Christopher Hatch**
**The Hatch Law Firm**
**624 Stoner Avenue**
**Shreveport, LA 71101**
**(318) 425-3965**
**COUNSEL FOR DEFENDANT-APPELLANT:**
        **Christopher Shon Mace**

**PICKETT, Judge.**

## FACTS

On October 17, 2011, the victim's mother took time off from work for a doctor's appointment. After seeing the doctor, she drove home, but when she entered, she heard the teenaged victim, D.R., "scream that [M]om's home."[1] She saw the girl run to the bathroom and realized she was naked from the waist down. The defendant, Christopher Shon Mace, who was D.R.'s stepfather, was in his underwear. He stated the situation was not what it appeared to be, but then suggested that he was teaching D.R. about sex. He also stated that it was a mistake. D.R. never discussed the matter in detail with her mother, but the subsequent investigation revealed that the defendant had engaged in multiple sex acts with D.R. on multiple dates.

On December 1, 2011, a Calcasieu Parish Grand Jury indicted the defendant Christopher Shon Mace for three counts aggravated incest, at that time violations of La.R.S. 14:78.1.[2] On July 21, 2015, the parties selected a jury. On July 22, 2015, proceedings began with opening statements and sequestration of the witnesses. However, the state advised that it had learned of a new witness. As will be discussed in more detail below, the defendant moved for a mistrial, which the court granted.

On January 12, 2016, the parties selected a jury for the second trial; the next day, said jury began hearing evidence. On January 15, 2016, it found the defendant guilty as charged. The district court sentenced the defendant on March 11, 2016, ordering him to serve three concurrent sixteen-year sentences. Four years are suspended, and the defendant is to be placed on supervised probation for five years.

The defendant now seeks review by this court, assigning four errors.

---

[1] The victim's initials are used pursuant to La.R.S. 46:1844(W).

[2] The incest statutes, La.R.S. 14:78 and La.R.S. 14:78.1, have been repealed. However, the offenses of incest and aggravated incest have been incorporated into "crimes against nature" and "aggravated crimes against nature." La.R.S. 14:89 and La.R.S. 14:89.1.

## ASSIGNMENTS OF ERROR

1.  The evidence adduced at trial is insufficient to support Defendant's multiple convictions for aggravated incest.

2.  The trial court erred when it denied Defendant's motion to quash; double jeopardy prohibited the retrial of Defendant after the mistrial in Defendant's first trial.

3.  This matter should be remanded for resentencing because Defendant's sentence is unconstitutionally excessive.

4.  The trial court erred when it declined to conduct an in camera inspection of the grand jury proceedings in the case for exculpatory impeachment evidence.

## ERRORS PATENT

In accordance with La.Code Crim.P. art. 920, all appeals are reviewed by this court for errors patent on the face of the record. After reviewing the record, we find there is one error patent.

A payment plan was not established for the $2,500.00 fine, court costs, and $150.00 presentence investigation report fee imposed as conditions of probation. In *State v. Arisme*, 13-269, pp. 3-4 (La.App. 3 Cir. 10/9/13), 123 So.3d 1259, 1262, this issue was addressed by this court:

> First, as a condition of probation, the trial court ordered a $250.00 fee to the Louisiana Crime Lab, for which a payment plan was not established. In *State v. Wagner*, 07-127, pp. 7-8 (La.App. 3 Cir. 11/5/08), 996 So.2d 1203, 1208, this court held in pertinent part:
>
>> When the fines and costs are imposed as a condition of probation, but the trial court is silent as to the mode of payment or the trial court attempts to establish a payment plan, this court has required a specific payment plan be established. *See State v. Theriot*, 04-897 (La.App. 3 Cir. 2/9/05), 893 So.2d 1016 (fine, court costs, and cost of prosecution); *State v. Fuslier*, 07-572 (La.App. 3 Cir. 10/31/07), 970 So.2d 83 (fine and costs); *State v. Console*, 07-1422 (La.App. 3 Cir. 4/30/08), 981 So.2d 875 (fine and court costs).
>>
>> We view this procedure as no different from payment plans for *restitution*. *See State v. Dean*, 99-475 (La.App. 3 Cir. 11/3/99), 748 So.2d 57, *writ denied*, 99-3413 (La.5/26/00), 762 So.2d 1101 (restitution only), *State v. Reynolds*, 99-1847 (La.App. 3 Cir. 6/7/00), 772 So.2d 128 (restitution, fine, and costs), *State v. Stevens*, 06-818

(La.App. 3 Cir. 1/31/07), 949 So.2d 597 (restitution, fine, court costs, and reimbursement to Indigent Defender Board), and *State v. Fontenot*, 01-540 (La.App. 3 Cir. 11/7/01), 799 So.2d 1255 (restitution, court costs and payments to victim's fund, Indigent Defender Board, and District Attorney).

We, therefore, remand this case to the trial court for establishment of a payment plan for the fine, noting that the plan may either be determined by the trial court or by Probation and Parole, with approval by the trial court. *See Stevens*, 949 So.2d 597.

Similarly, the trial court's ordering the payment to the crime lab fund during the period of probation is an insufficient payment plan. We also remand the case to the trial court for establishment of a payment plan for these costs, noting that the plan may either be determined by the trial court or by Probation and Parole, with approval by the trial court. *See Stevens*, 949 So.2d 597.

This issue has been similarly resolved in other cases. *See State v. LaCombe*, 09-544 (La.App. 3 Cir. 12/9/09), 25 So.3d 1002, and *State v. Snelling*, 09-1313 (La.App. 3 Cir. 5/5/10), 36 So.3d 1060, *writ denied*, 10-1301 (La.12/17/10), 51 So.3d 16. Accordingly, we remand this case to the trial court for the establishment of a payment plan for the fee, noting that the plan may either be determined by the trial court or by the Department of Probation and Parole with approval by the trial court. *See Stevens*, 949 So.2d 597.

This case is remanded to the trial court for the establishment of a payment plan for the aforementioned fine, court costs, and fee imposed as conditions of probation, noting that the plan may either be determined by the trial court or by the Department of Probation and Parole with approval by the trial court.

## ASSIGNMENT OF ERROR NUMBER ONE

In his first assignment of error, the defendant argues the evidence adduced at trial was insufficient to support his multiple convictions. Specifically, he contends that the state failed to present evidence of the dates when all of the offenses occurred.

This court has explained the general analysis:

When the issue of sufficiency of evidence is raised on appeal, the critical inquiry of the reviewing court is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560, *rehearing denied*, 444 U.S. 890, 100 S.Ct. 195, 62 L.Ed.2d

126 (1979); *State ex rel. Graffagnino v. King*, 436 So.2d 559 (La.1983); *State v. Duncan*, 420 So.2d 1105 (La.1982); *State v. Moody*, 393 So.2d 1212 (La.1981). It is the role of the fact finder to weigh the respective credibility of the witnesses, and therefore, the appellate court should not second guess the credibility determinations of the triers of fact beyond the sufficiency evaluations under the *Jackson* standard of review. *See State ex rel. Graffagnino*, 436 So.2d 559 (*citing State v. Richardson*, 425 So.2d 1228 (La.1983)). In order for this Court to affirm a conviction, however, the record must reflect that the state has satisfied its burden of proving the elements of the crime beyond a reasonable doubt.

*State v. Kennerson*, 96-1518, p. 5 (La.App. 3 Cir. 5/7/97), 695 So.2d 1367, 1371.

The state cites *State v. Foshee*, 99-1423, pp. 5-6 (La.App. 3 Cir. 4/5/00), 756 So.2d 693, 696, which explained:

This court has held that the date of the offense of aggravated rape of a child is not an essential element of that crime. *State v. Johnson*, 95-1002 (La.App. 3 Cir. 3/26/96); 670 So.2d 651. In *State v. Dixon*, 628 So.2d 1295 (La.App. 3 Cir.1993), this court upheld the defendant's conviction of aggravated rape of a seven-year-old victim even though no witnesses mentioned a specific date the crime was to have occurred. We concluded that all the testimony was related to the specific time frame within which the defendant had the continuing sexual relationship with the victim, and that specific dates were not necessary.

The date of offense is not a specific element of aggravated incest; thus, the holdings of *Johnson* and *Dixon* apply.

In the present case, the most concrete evidence regarding dates was set forth through repeated references to the incident on October 17, 2011, mentioned above. Also, the victim testified that the sex acts with her stepfather had been going on for "a couple of months" before then. More specifically, she stated that she and the defendant had sex the week before the October 17 offense. She testified that the sex acts took place over the course of four months. Other testimony indicated that the improper sexual conduct began in May 2011. The medical testimony indicated that the victim had been sexually penetrated on multiple occasions.

The facts of this case are analogous to the facts in *State v. Navarre*, 15-920, pp. 5-6 (La.App. 3 Cir. 4/6/16), 188 So.3d 478, 481- 82, *writ denied*, 16-800 (La. 5/1/17), 220 So.3d 742:

Finally, the defendant argues:

4

An important fact to note is that the indictment states that Mr. Navarre committed this crime between the dates of September 9, 2009 and September 9, 2011. The Defendant was in jail from August 3, 2011, until February 2, 2012. . . . It would have been impossible for the Defendant to have committed any act after August 3, 2011, contrary to the indictment and the allegations of C[.]M.

As noted above, the credibility of a witness goes to the weight of the evidence. The jury observed and heard C.M. testify as to what happened to him. While C.M.'s parents testified that C.M. was known to lie to them on occasions, they both stated that he would lie to get himself out of trouble but never lied solely to get someone into trouble.

Casie Barfield, a detective with the Lafayette Parish Sheriff's Office, was the lead detective in this case. Detective Barfield worked in the juvenile section and had extensive training in the physical and sexual abuse of children. The detective scheduled and observed an interview with the children's advocacy center for C.M. The detective testified that C.M.'s trial testimony was consistent with what he told the police and the children's advocacy interviewer. The detective noted it was not unusual for victims of sexual abuse to supply more details at trial, nor was it unusual for victims to wait for a few years before speaking out about the abuse. Finally, the detective stated that in these situations parents of sexual abuse victims often get the facts confused. The detective had no reason to believe that C.M. was not telling the truth.

. . . .

The State proved all of the elements of aggravated rape beyond a reasonable doubt. The sexual acts commenced when the victim was ten or eleven years old. Defendant had oral and anal sex with the victim. Based on C.M.'s account, the indictment alleged that the acts were committed between September 9, 2009, two days before the victim's tenth birthday, and September 9, 2011, two days before the victim's thirteenth birthday. It is of no import that Defendant was in jail in August 2011. The indictment did not allege all of the offenses occurred in August 2011. According to C.M.'s testimony, the first act of rape occurred when he was ten or eleven. Defendant has failed to show internal contradictions or irreconcilable conflicts between C.M.'s testimony and the physical evidence in this case. C.M.'s testimony was sufficient to establish the elements of the offense.

Considering the victim's testimony and other corroborating evidence that the abuse occurred over several months, the assignment of error lacks merit.

**ASSIGNMENT OF ERROR NUMBER TWO**

In his second assignment of error, the defendant argues the district court erred by denying his motion to quash, which was based on double jeopardy due to the

mistrial in the first trial. He acknowledges that a defendant's motion for mistrial does not normally bar the state from pursuing a second prosecution. However, he argues that the state may not retry him because it provoked the mistrial.

On July 22, 2015, the parties gave opening statements in the first trial, and the state's first witness testified. After some other matters were discussed, the following colloquy occurred:

**MS. KILLINGSWORTH [Prosecutor]:**

Your Honor, this morning while we were in court having openings and our first witness testifying a phone call was received by my office that was to me, but I couldn't take the call obviously. I got the message and it was from a man who said that he had information about this case and his name was John Duplechain. I asked Ms. Rhodes-May to call him back to find out what information he had and he stated to me that he worked -- or to her that he worked with the defendant at the time that all of this occurred and that he had had a conversation, including another employee, and Mr. Mace concerning his wife catching him having sexually inappropriate conduct with his wife.

**THE COURT:**

Not with his wife.

**MS. KILLINGSWORTH:**

Not with his wife, with his daughter, his stepdaughter.

**THE COURT:**

Okay.

**MS. KILLINGSWORTH:**

Who is the victim in this case. The details that he gave are very similar to other details that I have with regard to statements given in this case; that only somebody who knew or talked to the defendant would know. So I'm led to believe that this is accurate. Also, there were two other people who could confirm the conversation. I have talked to one -- or we have talked to one of them who has confirmed the conversation between he and Mr. Tybee and Mr. Mace, being Mr. Duplechain and Mr. Franks was around, not in that exact conversation, but they all discussed it together and about what the ramifications were of it. They failed to call. Nobody notified us. We had no idea that this conversation had occurred until this morning.

6

The State is requesting in its supplemental motion to be allowed to use that information, the statements that the defendant made to those men.

**THE COURT:**

Okay, Mr. Carter.

**MR. CARTER [Defense Counsel]:**

Your Honor, the defense has planned and prepared its defense carefully and has spent a lot of hours on it and sent discovery to the State on many occasions, supplemental discovery, so we're very concerned about what the evidence might be in this case so we can defend. We have anticipated everything that has happened in this case until this and everything was going as we expected it to go and as we expected it to tie into our defense. We come up with this newly discovered evidence the third day of the trial and it is highly prejudicial to the defense.

. . . .

**MS. KILLINGSWORTH:**

Perhaps we can recess.

**MR. CARTER:**

No, no, I'm not going to have time right now. It's going to take me weeks to run this down. This man lives in Houston and I don't know where these other two witnesses are. It's going to take a lot of time to run this stuff down, at least three weeks, okay. Now, look, if he's in Houston I'm going to have to send somebody to Houston.

. . . .

**[THE COURT:]**

Anyway, here we are now. So the State has had about two hours and 15, 20 minutes or so to try to -- over lunch to try to contact these witnesses. They talked to two out of the three and based on those conversations the State wants to go forward with calling those witnesses. In response to what Mr. Carter said, I don't think the State is trying to get a mistrial here by any means. I do think -- I agree with the State when Ms. Killingsworth characterized this as critical evidence. I think it is critical evidence and because of that it's very highly prejudicial to the defendant for the State to be wanting to offer, you know, halfway through this -- you know, into -- you know, halfway through the third day of trial, over halfway through. Well, two days for jury selection. You know, we actually started opening statements and evidence this morning, but two days, two and a half days into the week, to offer

7

statements made by the defendant. I mean it's highly prejudicial to the defendant and, you know, the defendant has already made an opening statement, even though they didn't want to, they wanted to wait, they gave an opening statement and said what they expected the evidence to show and now this got sprung on them and I think it's prejudicial to the defense to have -- to be told about this type of incriminating, highly critical statements, made by, you know -- against his client's interest, against the defendant, but since the State just learned about it -- I mean I don't find that it was their fault. I mean through no fault of the State, you know, they just learned about this information, you know, so my inclination at this point is to say to the State I think you're entitled to use this information. I don't find that the State did anything improper. As soon as they found out about it they alerted Mr. Carter and the Court and gave the information. So I mean as quickly as you could have done it with the information that was within the State's possession and you have a right to use it; however, because of the undue prejudice that it would cause to the defense and, you know, in order for the defendant to have an opportunity to fairly prepare for trial in light of such prejudicial information being brought up at this point I'm just going to just give the State the option of either declining to use this information and going forward. I'm not going to order that it be excluded because in fairness to the State, they just found out about it, and it is something that they have an obligation to try to use since the State only gets one bite at the apple here so to speak; however, if the State -- if you decide you want to go forward with this information I'm going to be forced to grant a mistrial at the request of the defense and Mr. Carter has already indicated.

So, State, I'll go ahead and put that ball in your court and ask you. Do you want to go forward with this case -- I mean with this newly discovered information or do you want to -- at which case I will then grant a Motion for Mistrial made by the defense or do you want to proceed without this information?

. . . .

**MR. CARTER:**

Your Honor, thank you for allowing me to go talk to my client about this issue, this newly discovered evidence. I talked with him and first of all he asked me and I would for the record strongly object to the Court's ruling that he would allow the State to use this evidence, this newly discovered evidence of Mr. Duplechain, Tyree, and Franks. That denies him the trial that we have set up at this time; however, he agrees that he cannot feel he has a fair trial if he is not permitted to investigate, discredit -- we think we'll discredit this at the time, and we would ask -- forced to ask for a mistrial, forced to ask for a mistrial [sic], because of the Court's ruling allowing this evidence in and so he agrees and so we

8

would, therefore, ask for a mistrial reluctantly because of the ruling.

**THE COURT:**

All right. Any comments from the State?

**MS. KILLINGSWORTH:**

I don't think there's anything more I can say, judge.

**THE COURT:**

All right. Well, let me say this, and again I think I've said this a while ago, but just for the record again let me just say that I -- if the State had had this information prior to today and they failed to disclose it until today I would not allow that testimony. I would exclude it and we would go forward without it; however, it was information that they just learned about today through no fault of their own and because of that and it is highly relevant information and I think is something that they should be able to use and -- but in fairness to the defense I think the defense needs to have time to prepare, so I think a mistrial is appropriate.

**MR. CARTER:**

Your Honor, I apologize, but could the Court order a mistrial without me having to move for a mistrial?

**MS. KILLINGSWORTH:**

No.

**THE COURT:**

No, I don't think so.

**MR. CARTER:**

That's my problem. That's my preference, but you're probably right and so on that issue -- so that's why I reluctantly ask for a mistrial.

**THE COURT:**

I understand.

**MR. CARTER:**

If the Court could do it on its own I think it would be proper for the Court to do it on its own.

**THE COURT:**

9

Right, but I don't think I can. But let me just say this. Look, I'm not happy about this at all. You know, there have been multiple occasions where this case has been set for trial and it's had to be continued and, you know, when we finally got this case to trial and now because of this, you know, issue that came up now I mean it's going to be mistried.

So believe me, if there was a way around it that I could see that was in the interest of justice I would do it. I mean we would go forward with it, but in any event. Look, based on the Court's ruling and the motion by Mr. Carter on behalf of the defense I'm going to grant the mistrial and so do you want to --

**MS. KILLINGSWORTH:**

Can we reset it?

**THE COURT:**

Yeah, we can go ahead and reset it.

The general foundation of the defendant's argument is that the principle of double jeopardy barred the second trial. It is not clear whether the defendant made this specific argument in the district court, but a double jeopardy error can be raised anytime. La.Code Crim.P. art. 594. Double jeopardy does not normally bar retrial after the granting of a mistrial. La.Code Crim.P. arts. 591, 775. The defendant acknowledges that mistrial does not necessarily bar retrial, but both parties cite *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083 (1982), for the principle that prosecutorial conduct intended to provoke a defendant into moving for mistrial will bar retrial.

This court has previously discussed the Supreme Court's ruling in *Oregon v. Kennedy*:

The defendant asserts, in both his counseled and pro se briefs, that his convictions violate the constitutional prohibitions on double jeopardy due to the mistrial granted in his second trial. The constitutional protections contained in the United States and Louisiana constitutions protect criminal defendants from repeated prosecutions for the same offense. U.S. Const. amend. V; La. Const. art. 1 § 15. The standard concerning the application of the double jeopardy doctrine to cases involving mistrials was addressed in *Oregon v. Kennedy,* 456 U.S. 667, 675–76, 102 S.Ct. 2083, 2089, 72 L.Ed.2d 416 (1982), wherein the United States Supreme Court stated that:

Prosecutorial conduct that might be viewed as harassment or overreaching, even if sufficient to justify a mistrial on defendant's motion, therefore, does not bar retrial absent intent on the part of the prosecutor to subvert the protections afforded by the Double Jeopardy Clause. . . . Only where the governmental conduct in question is intended to "goad" the defendant into moving for a mistrial may a defendant raise the bar of double jeopardy to a second trial after having succeeded in aborting the first on his own motion.

Here, the record reflects that, after the defendant's first trial but before his second trial, one of the Vernon Parish detectives interviewed Jody Thibeaux. During that interview, Mr. Thibeaux told the detective that he had heard that a loaded gun had been found in Kristyn's bedroom at least three years before Christopher's murder. However, the detective failed to put that information in his report, and the record indicates that it was not provided to the defendant. On the eighth day of the second trial, the defense learned that the State had information concerning Kristyn's previous possession of a handgun. Based on the State's failure to disclose what it contended was clearly *Brady* material, the defense moved for a mistrial. Although it is unclear from the record to what extent the State conceded that there was a *Brady* violation, it appears that, at minimum, the State did not object to the trial court's grant of the mistrial.

Before the defendant's third trial, the defense filed a motion to quash on the basis that the State intentionally provoked a mistrial and that the prosecution was now barred by double jeopardy. The defendant argued that the State was in bad faith in failing to provide the *Brady* material and that the State engaged in a "continuing course of conduct" by repeatedly failing to provide *Brady* material. After a hearing, the trial court found that the evidence did not support a conclusion that the State intended to provoke a mistrial or that the defendant had suffered any prejudice as a result of the grant. Accordingly, the trial court denied the defendant's motion.

Even if the State's actions could be construed as overreaching or harassment, the defendant still had to prove that the State intended to provoke the mistrial. Our review of the record reveals that the defendant failed to do so.

Thus, we find no manifest error in the trial court's factual determination that there was insufficient evidence to prove that the State intended to provoke a mistrial and that the defendant did not suffer any prejudice as a result of the mistrial.

*State v. Sizemore*, 13-529, 13-530, pp. 3-5 (La.App. 3 Cir. 12/18/13), 129 So.3d 860, 864-65, *writ denied*, 14-167 (La. 8/25/14), 147 So.3d 699. (citations and footnotes omitted).

11

Similarly to the defendant in *Sizemore*, the defendant in the present case has failed to demonstrate that the state intentionally acted to provoke a mistrial. Contrary to the defendant's assertions, the present case is "not a paradigmatic example of the State intentionally goading the defense into a mistrial" nor did the state gain a "clear opportunity to present an even stronger version of their [sic] case." Arguably, the state was in at least as strong a position in the first trial, as the district court ruled the new evidence at issue admissible, and the defendant was caught off-guard. The defendant argues that the decision to request mistrial was taken out of his control by the situation. He had at least one other option – to seek a recess – but he eschewed it. Further, as the district court later pointed out, he could have sought a writ.

The district court's ruling that the new evidence was admissible certainly placed the defendant in a poor tactical position, but that ruling is not at issue. For the reasons discussed, the assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER THREE

In his third assignment of error the defendant argues, as he did in district court, that his sixteen-year sentence, with all but twelve years suspended, was excessive. The analysis for such claims is well-settled:

> Sentences within the statutory sentencing range can be reviewed for constitutional excessiveness. *State v. Sepulvado*, 367 So.2d 762 (La.1979). In *State v. Barling*, 00-1241, 00-1591, p. 12 (La.App. 3 Cir. 1/31/01), 779 So.2d 1035, 1042-43, *writ denied*, 01-838 (La. 2/1/02), 808 So.2d 331, a panel of this court discussed the review of excessive sentence claims, stating:

> > [Louisiana Constitution Article] I, § 20 guarantees that, "[n]o law shall subject any person to cruel or unusual punishment." To constitute an excessive sentence, the reviewing court must find the penalty so grossly disproportionate to the severity of the crime as to shock our sense of justice or that the sentence makes no measurable contribution to acceptable penal goals and is, therefore, nothing more than a needless imposition of pain and suffering. *State v. Campbell*, 404 So.2d 1205 (La.1981). The trial court has wide discretion in the imposition of sentence within the statutory limits and such sentence shall not be set aside as excessive absent a manifest abuse of discretion.

*State v. Etienne*, 99-192 (La.App. 3 Cir. 10/13/99); 746 So.2d 124, *writ denied*, 00-0165 (La. 6/30/00); 765 So.2d 1067. The relevant question is whether the trial court abused its broad sentencing discretion, not whether another sentence might have been more appropriate. *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, *cert. denied*, 519 U.S. 1043, 117 S.Ct. 615, 136 L.Ed.2d 539 (1996).

Further, in reviewing the defendant's sentences, the appellate court should consider the nature of the crime, the nature and background of the offender, and the sentences imposed for similar crimes. *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57 (citing *State v. Telsee*, 425 So.2d 1251 (La.1983)), *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183. In *State v. Smith*, 02-719, p. 4 (La.App. 3 Cir. 2/12/03), 846 So.2d 786, 789, *writ denied*, 03-562 (La. 5/30/03), 845 So.2d 1061, a panel of this court observed that:

> While a comparison of sentences imposed for similar crimes may provide some insight, "it is well settled that sentences must be individualized to the particular offender and to the particular offense committed." *State v. Batiste*, 594 So.2d 1 (La.App. 1 Cir. 1991). Additionally, it is within the purview of the trial court to particularize the sentence because the trial judge "remains in the best position to assess the aggravating and mitigating circumstances presented by each case." *State v. Cook*, 95-2784 (La. 5/31/96); 674 So.2d 957, 958.

*State v. Soileau*, 13-770, 13-771, pp. 4-5 (La.App. 3 Cir. 2/12/14), 153 So.3d 1002, 1005-06, *writ denied*, 14-452 (La. 9/26/14), 149 So.3d 261.

The sentencing court's comments were detailed:

THE COURT:

> All right. Thank you. All right. Anything else from the other side? All right, let me say this, I have a lot [to] say, yeah, y'all come on up to the podium. You know, Mr. Brown, is certainly right when he said this is one of the most difficult parts of the job of a judge is to determine a sentence when I have such a broad sentencing range to deal with. I've got family members. I've got victim[']s family. I've got the defendant's family, you know. The victim's family, you know, wants the defendant, you know, maxed out and under the jail. And the defendant's family wants him to walk out of the court room with no jail. And you know, and everybody's got their own idea of what justice is in this case, but I'm charged with that ultimate determination of what is a just sentence. There are certain things kinda strike me about this case and about certain aspects of the case. And about these letters, I guess I want to say that I am probably going to upset some family members, I guess when I say this. But you know, I think that, when I looked at all these letters, I'm not sure how many of these folks

13

that wrote letters were actually in the court room to listen to everything that happened during that trial. And it may be that some of them, if they were there, they were only, you know, I guess maybe hearing what they wanted to hear, but I - - one of the things that struck me is everybody, everyone - - and let me just say this - - I didn't count them all. I probably got - - I don't know if I ever received more letters than this on behalf of a defendant. I did receive a couple of letters from the victim and her mother. And I did read the pre-sentence report. I read the couple of letters from Mr. Mace, the defendant. I got a lot of letters from family and friends. And I read every single one of them. And one of the things though that strikes me about, overwhelming majority of these letters is that how these people say how he would never do that. I don't believe he would do something like this. Or they don't think he could ever do something like this. And I believe that's why they wrote these letters is because they don't think he would do it. They don't think he's guilty. And only just two or three people, it seems, as I recall, acknowledge the possibility of Mr. Mace's guilt. And you know, but somebody wrote me a letter, Billy McRoy, I'm just pointing this one letter out. There are some others that are somewhat - - but after he types his letter to me, he writes on there, "There is no way he's guilty of any type of child abuse." As if he has any clue about what happened in this case, that he was he. [sic] Because if he had heard any evidence or anything at all like that. And so, that's what I get. I get all these overwhelming number of letters from people who are totally ignorant about what really happened in this case. . . . But anyway, one thing that I guess, normally, at least when I get letters on behalf of the defendant, there's some of acknowledgment of some amount of compassion toward the victim in this case, I mean in that particular case. I don't know if there is even one letter in here that does that. . . . I - - the victim in this case - - I hear about what you are saying when you say your sons, your sons, your sons. I mean you've been with your wife for four years, but I mean they're your step-sons. I realize it sons [sic] better for you to call them your sons when you write your letter. But in any event, or your children, but the relationship that these children talk about having with you, Mr. Mace, and how great it is and how inspiring it is, the young lady who is a victim in this case thought she had that same relationship too. From the time she was a little girl. I'm trying to think, remember if her father had passed away or something like that. You were the father in her life. She trusted you. She depended on you to be her father, her protector. So all of what I hear from all these other people about how great you are and how all these kids need you and look up to you, etcetera. She did too and then you chose, and the thing is, I think a lot of these letters that I've gotten also are from people that totally misunderstand what a child's abuser look [sic] like, a child's sexual abuser looks like. All child, yeah, you have child abusers or molesters, or whatever, that do, you know, molest children without getting to know them. They may inappropriately touch them etcetera. You know without trying to develop a relationship, but the overwhelming majority of people who sexually abuse children, develop a relationship with them. A

14

relationship of trust so they can have that access to them. So that they can abuse them. There's a process called, it's called, referred to as grooming. You groom them to where, you know, you slowly work your way up to the type of abuse that you perpetrated in this case. And, you know, and so what you did, see, all the family and friends, people that you know that wrote all these letters for you that don't understand that, think well there's no way. I trust my kids around him. Well, it's because apparently you are not in the position to groom any of those kids and then you probably don't have any interest in boys. All, you know - - all child sex abusers all have different preferences, different types, just like other people do. But, in any event, I saw the pattern here. I saw the pattern as I heard the testimony about what you did. It was clear to me that you were following along that pattern and it made much more credible and believable to me, when I heard the testimony. . . . I mean, you and your story were not credible whatsoever. I didn't find it to be credible and neither did those jurors. And they were the ultimate triers of fact. And you know, they saw it for what it was. . . . Well, you weren't selfless when you were dealing with this child who - - you were her father figure from the time she was four years old. You weren't selfless at all there. You used her as your sex - - to satisfy your sexual gratification. Your sexual desires. While you are watching your Japanese pornography. I mean, it's disgraceful. So I hear on the one hand all these great things everybody says about you. Of course at the same time, they believed every lie you told them about how you didn't do this. And I guarantee if they knew that you did it, which you may never admit. And I think that you were saying a while ago that I apologize for things getting this far. I think Ms. Killingsworth was right. You're trying to strike a balance between trying to act like you've got some remorse without letting your family members see that you're actually admitting - - so you're caught in a hard place there because all of these people say that they believe in you. They believe you didn't do it. They don't - - they believe your total innocence because they are blinded by their concern and care for you as their family member. But it couldn't be more clear that you are guilty of this crime. . . . And listened [sic], I'm not saying that you don't have some good qualities. Not suggesting you haven't done some good things for people in your life. I'm not suggesting that at all. But, you know, actually there are even some people in here, two or three people that are, you know, blaming in addition to the young victim here, but I mean blaming her mother. Well, she's got some blame here too, you know, blah, blah, well no matter how bad your relationship may have been with the victim's mother in this case, that would never be a justification for victimizing her. Obviously if you are sexually frustrated in your marriage, you said you had an affair. Maybe that's what you go do. If you can't handle it otherwise through these, you know, through these Christian values that everybody says that you have. But you never ever go victimize a child because you're sexually frustrated in your marriage. Which I'm assuming these people are alluding to and maybe that is or whatever when they make those comments. But it's - - So what is justice? That's what I struggle with. Everything that I have said or

things that go through my mind. Your side of the family could care less about her and they believe she is a liar. And they don't, they have no compassion for her whatsoever, cause I didn't read any of it in any of this. And you created that scenario for all of them that believe that. Through your lies and your deception and your manipulation of everybody involved in this case. . . . But I don't know how long this is going to affect her. I've read her letter. She's trying to move beyond what happened. She's had counseling for a period of time and I hope for her sake that she can get the right counseling she needs and realize that it's not her fault. . . . She has some trust issues with older people and it's understandable. So, in any even [sic], even up to this moment, I'm struggling with the appropriate sentence. I've had some various things come to mind. Various sentencing options come to mind, and you are facing, as it was said a minute ago, a five year minimum and a twenty year maximum in this case. And a fine for up to $50,000 and prison with or without hard labor for not less than five no more than twenty years or both. All right. I'm going to impose a sentence of sixteen years Department of Corrections. I'm going to suspend four of those years. I'm going to place you on, which means that you are going to have to serve twelve years with the Department of Corrections. Place you on five years of supervised probation. Once you complete that twelve years, you will be on five years of supervised probation under the general terms and conditions of Article 895, the Code of Criminal Procedure. And the following special conditions; you are to have no contact whatsoever no unsupervised contact with any minor children. You are to have no contact with the victim in this case or her family. You are to pay a fine of $2,500 plus court cost. By the way, that twelve years that you are serving that's, well, you know what, I'm assuming that falls under the 85 - 100% crime, right?

MR. BROWN [Defense counsel]:

I believe so, Your Honor.

THE COURT:

Okay, I just want to make sure. You are to submit random drug screens at the discretion of your probation officer. You are to have no, you are not to possess any pornography whatsoever. You are to submit to sex offender counseling as directed by your probation and parole officer. You are to pay a $150 fee to the office of probation and parole for their cost of preparing this pre-sentence report. You are to follow all the registration laws for registering as a sex offender that are in effect at the time of your release. You will pay a $60 per month supervision fee and $11 per month sexual offender technology fund fee. Let me say this, and commit no other crime. I'm just making sure if there is anything I am leaving out. Oh yeah, you are going to do sixty eight-hour days of community service. Is there anything that I am forgetting that y'all could think of?

16

MS. KILLINGSWORTH:

Your Honor, I believe that a lot of the root of the problem here is an addiction to pornography. I would think he should be treated for that.

THE COURT:

Well I've ordered him not to have or possess any pornography or view any pornography, but I guess I'll have him - wouldn't you think they would do that as part of sex offender counseling?

MS. KILLINGSWORTH:

I don't know. That's why I mentioned it.

THE COURT:

I guess I'll just mention that. Sex offender counseling maybe with an emphasis on pornography.

MS. KILLINGSWORTH:

I think that's fair enough.

THE COURT:

I want to say a couple of things. You know, your family asked for mercy, you asked for mercy. I don't know if you realize that I just showed you mercy, because I was going to give you more time, more prison time than that. I decided to reduce the amount of prison time I was going to give you in order to put you on probation for five years. So that we could have a you under supervision for a longer period of time. So after you do that twelve years, you'll be on five years of probation. So we'll have you between being in prison and being under supervision for the next seventeen years. And I do need to put on the record, also that you are legally considered a first offender and generally the appellate courts don't favor maximum penalties for first offenders. So, I took that into consideration. I know the victim's family asked me to do the maximum, but I have, you know, I don't want to do anything, I don't want to have to waste time coming back here doing a re-sentencing because the Court of Appeals thought that I should not have given him the maximum on that sentence for a first offender. But, also I did take in for the record - - I took into consideration the aggravating and mitigating factors under Article 894.1 of the Code of Criminal Procedure. And I won't enumerate those. But I did take into consideration the various factors that are set forth in 894.1. And you know, like I said, I - - this is the toughest part of my job, you know, and sometimes it's easy just to sledgehammer somebody that really deserves it. But I have to look at a lot of different factors as I'm sentencing. You are going to do twelve

17

years in prison and I expect you to do each and every day of that twelve years and then you will be on probation with four years hanging over your head if you violate your probation. . . . And I'm just going to leave that alone. I'll just leave it at that. I'm going to go ahead and file all these letters into the record. And I'm going to file a pre - sentence report under seal as required by law. And - -

MR. BROWN:

Your Honor, you gave the sentences, but you only - - you didn't speak to each count.

THE COURT:

Oh, I'm sorry. Well, because of the - - I considered that sentence to include the three counts. I'll make it concurrent on each of the three counts.  What else?

MR. BROWN:

You said you expect him to serve each and every day. So, - -

THE COURT:

He'll get whatever the law allows him to get. If they want to give him any good time, that's up to them.

The district court's detailed discussion addresses the first two factors noted in *Soileau*, 153 So.3d 1002, and set forth in *State v. Lisotta*, 98-648 (La.App. 5 Cir. 12/16/98), 726 So.2d 57, *writ denied*, 99-433 (La. 6/25/99), 745 So.2d 1183, regarding the nature of the offense and the offender's background.  As noted in *Soileau*, the final *Lisotta* factor is a comparison to the sentences in other cases for the same type of offense.  The defendant cites *State v. R.A.L.*, 10-1475 (La.App. 3 Cir. 6/29/11), 69 So.3d 704, in which this court addressed the defendant's best-interest pleas to forcible rape and aggravated incest and reduced his illegally-excessive sentence to the applicable minimum of five years.  Although not explicitly stated, it appears the court chose this term because it was the minimum sentence applicable at the time of the offense, and the defendant had agreed as part of the plea to take the minimum term he thought was applicable at the time of the plea. *Id*. at 706-08.

In the present case, the defendant also cites *State v. Barbain*, 15-404 (La.App. 4 Cir. 11/4/15), 179 So.3d 770, *writ denied*, 15-2213 (La. 4/4/16), 190 So.3d 1201, *and writ denied*, 15-2179 (La. 4/4/16), 191 So.3d 578, in which the fourth circuit approved a ten-year sentence for aggravated incest which ran concurrently with a life sentence for aggravated rape. The defendant characterizes the facts of *Barbain* as "far more egregious" than those in his case, presumably because the offenses in *Barbain* occurred over a longer period of time. He also notes the total ten-year term for two counts of aggravated incest and one count of attempted aggravated incest in *State v. J.M.*, 07-453 (La.App. 3 Cir. 10/31/07), 968 So.2d 1164. He notes there was evidence the defendant in *J.M.* threatened the victims. *See State v. J.M.*, 06-624 (La.App. 3 Cir. 11/2/06), 941 So.2d 686.

The state cites *Foshee*, 756 So.2d 693, which involved eleven counts of incest against two victims; the defendant was sentenced to a total of thirty-six years. Two of the counts resulted in eighteen-year sentences, consecutive to one another. The six-year terms on the remaining counts were consecutive to one another and concurrent with the first count.

In *State v. Stephens*, 42,796, 42,797 (La.App. 2 Cir. 12/5/07), 973 So.2d 145, *writ denied*, 08-165 (La. 6/20/08), 983 So.2d 1271, the defendant received twenty years for aggravated incest in a case that also involved molestation of a juvenile. The defendant was a third felony offender, and one of the offenses was against his stepson. In *State v. Urena*, 15-1065 (La.App. 3 Cir. 4/6/16), 215 So.3d 813, *writ denied*, 16-1209 (La. 5/19/17), 219 So.3d 336, the defendant ultimately received a total sentence of twenty years on multiple counts of aggravated incest.

The sentencing terms in the cases discussed above show that the sentences for the defendant in the case before us do not fall outside the norms of Louisiana jurisprudence. Therefore, the assignment of error lacks merit.

## ASSIGNMENT OF ERROR NUMBER FOUR

In his fourth and final assignment of error, the defendant argues that the district court erred by declining to conduct an in camera inspection of grand jury testimony to determine whether any of said testimony contradicted trial testimony regarding video evidence. In *State v. Higgins*, 03-1980, p. 35 (La. 4/1/05), 898 So.2d 1219, 1241, *cert. denied*, 546 U.S. 883, 126 S.Ct. 182 (2005), the supreme court explained that a defendant is not generally entitled to a transcript of a grand jury proceeding, citing La.Code Crim.P. art. 434. The purpose of this rule is to encourage full disclosure about a crime before a grand jury. *Id.* In certain situations, though, justice may require that discrete portions of the proceedings before a grand jury can be divulged. *Id.* A defendant must make "a specific request stated with particularity" in order the have a district court review grand jury transcripts *in camera*. *Id.* at 1241.

> A party seeking disclosure has the burden of proving a 'compelling necessity' for the material sought, and the need must be demonstrated 'with particularity.' That is, the party seeking disclosure must prove that, without access to the grand jury materials, the party's case would be 'greatly prejudiced' or that an 'injustice would be done.'

*State v. Ross*, 13-175, p. 7 (La. 3/25/14), 144 So.3d 932, 937-38, quoting *Higgins*, 898 So.2d at 1241.

The trial court did not find that the defendant demonstrated "with particularity" a "compelling necessity," as explained in the following colloquy:

MR. BROWN:

> Yes, Your Honor. We presented Your Honor with a motion for new trial along with a motion to unseal the grand jury testimony for en [sic] camera inspection under Code of Criminal Procedure Articles 434 and 434.1. Starting with the motion to unseal the grand jury testimony, the crux of our argument is saying that the grand jury - - if statements were made to the grand jury that there was, as Your Honor recalls, there was much testimony given as to how much video the state had in their possession whenever they essentially lost the video. And many statements were given by law enforcement and State's witnesses as to how much video there was. We had multiple hearings on the video. Had the motion to suppress hearing. They essentially said there was no more than twenty-one days. Then they came back at trial and said

20

there was no more than fifteen days of erased material. And what we are asking for as the defense is, if there was [sic] statements to the grand jury, in which there were statements that there was ninety days of video, then those were prior inconsistent statements. And those statements should have been turned over to the defense attorneys. And would constitute Brady material as to prior inconsistent statements of the State's witnesses. So, what we are asking for is an en [sic] camera inspection of that grand jury testimony to determine whether, or not, there were these ninety-day statements. It's based upon information belief and even statements of State witnesses - - of the victim's family saying that they believe there was ninety days of video. And what we are asking for is to essentially check and see if there were statements to the grand jury that there was ninety days of video, because that essentially would change the motion to suppress and also the statements at the trial. So that's what we are asking Your Honor to, either allow the defense to look at those matters or if Your Honor is inclined to look at those matters Himself to determine whether, or not, they made those statements.

. . . .

THE COURT:

Well, as I appreciate it and tell me if I am correct in this, you're saying that you believe that there were representations made at the grand jury proceeding to the grand jury by a detective or a prosecutor or somebody, that there were ninety days of video to support the charges or to support each count - -

. . . .

THE COURT:

I guess what I'm trying to figure out is - -

. . . .

THE COURT:

I guess what I'm saying is, your [sic] just saying your [sic] just saying [sic] some, these generalized terms that the victims were told and were you talking to the victims? You've got information from the victims?

MR. BROWN:

No. The victim's mother on the stand said that she believe [sic] there was [sic] ninety days of video.

THE COURT:

Because she said that's what her husband, Chris, told her.

21

MR. BROWN:

No. What she said was that, that's what discovery showed. She said, I believe I read that in discovery. And in addition to that, there are, we've been told there's other people saying that, that's what they told the victim's family. That we went from five counts to three counts, because we had ninety days of video.

MS. KILLINGSWORTH:

Well, that's not accurate.

THE COURT:

So, you're saying that you didn't talk to any of these people about after that, you know, the things that you're saying - -

MR. BROWN:

Well, Your Honor - -

THE COURT:

- - you found out after this trial that people are saying this or that, I mean, - - I guess I'm just trying to figure out if I remember her saying she found out, I mean, she thought it was ninety days, because that's what Chris Mace told her. I don't remember her saying the victim's mother saying she read it in discovery that it was ninety days. I don't - -
. . . .

THE COURT:

I just - - that doesn't - - but even if she might have meant she read it in y'all's motions. The defense's motions. But I don't know if that's, I mean, I would think that's something that if she testified to it. You asked her the question. You know, at the trial.

MR. BROWN:

Well, Your Honor, the question is whether or not the detectives made these statements at the grand jury.

THE COURT:

Okay. But for her to testify to [sic] trial that she saw it in discovery, and you're making a leap to say, that well, I mean I [was] just wondering, okay. Where are you being told? Who told you? What credible information do you have to say that somebody told these grand jurors there's ninety days worth, that's why we

only think you should indict for three counts. Ninety days worth of video.

MR. BROWN:

Well we know that Detective Primeaux testified that he started with five counts because there was [sic] five months of allegations.

THE COURT:

Right.

MR. BROWN:

What we know is that for some odd reason it just dropped down to three months, I mean, three allegations. So, what we are trying to find out is whether, or not, that's the reason. And it wouldn't take long to actually look at this and see, okay if they made the representation that there was [sic] three months of video. And then subsequent to that, they found out there wasn't. . . . Because at first there were three counts they were just saying certain time periods, and we felt like that's the issue, is that if they went from five counts to three counts based on evidence or information by the detective saying there was just ninety days of video, then that's something the defense needs to - -

THE COURT:

Well listen, I think that's just some kind of pure unfounded speculation to be asking for that reason because, if he said he filed the or he just made it simple to say one count for each month. Because the allegation was apparently that it happen [sic] much more than that, just five times. But he just made it simple and said once for each month that this alleged allegation was going on. To then say, oh well the grand jury must have thought the same thing, because there's three months of video and they only are indicting - - they're only assuming that there would only be one count per month during that ninety day period, so they only indicted for - - I mean that doesn't even - - I just think that's really stretching, I think that's really stretching things. And that's just pure speculation that the grand jury would do one per month just because that's what Detective Primeaux said. He based his initial five counts on. That doesn't really make a lot of since to me if the jurors, I would expect, would want to at least have some either see that video or at least have testimony that hey it happened once a month during these ninety days on this video. So that's what we are go [sic] with. I think you've got to have a lot more that. I'm not going to order this with that. That's just rank speculation. I'm not going to waste anybody's time on that.

MR. BROWN:

We would object for the record, Your Honor.

THE COURT:

All right.

MR. BROWN:

We just note that we alleged under article 434 and 434.1 why, and with particularity why we wanted to unseal the grand jury's testimony. And we'd object to Your Honor's ruling.

THE COURT:

All right. That's fine. Let me just say I don't find that there is particularity enough. I think that's just general speculation with no basis, no particularity whatsoever. I haven't heard any particularity as far as why there is any kind of basis for that. Anyway, let the objection be noted for the record, but I'm denying the motion.

The district judge's ruling was correct. The defendant's arguments, both in the district court and in his current brief, lack specificity and particularity. This assignment of error lacks merit.

## CONCLUSION

The convictions and sentences of Christoper Shon Mace are hereby affirmed. However, this matter is remanded to the trial court for the establishment of a payment plan for the $2,500.00 fine, court costs, and $150.00 fee imposed as conditions of probation, noting that the plan may either be determined by the trial court or by the Department of Probation and Parole with approval by the trial court.

**AFFIRMED AND REMANDED WITH INSTRUCTIONS.**

24