NOT DESIGNATED FOR PUBLICATION

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

NUMBER 2020 KJ 0928

STATE OF LOUISIANA

IN THE INTEREST OF M.J.

Judgment Rendered: **FEB 1 9 2021**

* * * * * *

Appealed from the
Juvenile Court
In and for the Parish of East Baton Rouge
State of Louisiana
Docket Number 114187
Honorable Gail Grover, Judge Presiding

* * * * * *

| | |
|---|---|
| Hillar C. Moore, III<br>District Attorney<br>Andrea D. Neal<br>Assistant District Attorney<br>Baton Rouge, Louisiana | Counsel for Appellee<br>State of Louisiana |
| Katherine M. Franks<br>Madisonville, Louisiana | Counsel for Defendant/Appellant<br>M.J. |

* * * * * *

**BEFORE: GUIDRY, McCLENDON, AND LANIER, JJ.**

McClendon, J., concurs and assigns reasons.

**GUIDRY, J.**

The State filed a delinquency petition in case number 114187 against M.J.,[1] a sixteen-year-old juvenile, based upon the alleged commission of two counts of armed robbery (counts one and two), violations of La. R.S. 14:64, and illegal possession of a handgun by a juvenile (count three), a violation of La. R.S. 14:95.8.[2] M.J. filed a combined motion to suppress and, alternatively, motion in limine to exclude the out-of-court and in-court identification of the accused. After a hearing on the combined motion, the juvenile court denied the motion, proceeded with the first day of a two-day adjudication hearing, and entered directed verdicts finding M.J. not to be delinquent under counts one and three. On the second day of the adjudication hearing, the juvenile court adjudged M.J. to be delinquent as to count two. After a disposition hearing, M.J. was committed to the Department of Public Safety and Corrections, Office of Juvenile Justice, for twenty-four months. M.J. now appeals, arguing that the juvenile court erred in denying his motion to suppress and/or in limine to exclude the identifications and that the evidence is insufficient to support the adjudication. After a thorough review of the record and the two assignments of error, we affirm the adjudication and disposition.

## STATEMENT OF FACTS

On October 5, 2019, around 10:30 p.m., Carley Davis gave a ride to four male youths after seeing them in front of the Belle of Baton Rouge Casino and Hotel. Davis was driving, and her friend, Asia Nguyen,[3] was in the passenger seat

---

[1] M.J.'s date of birth is November 11, 2003. As a minor, he will be referred to by his initials to ensure his confidentiality. See Uniform Rules of Louisiana Courts of Appeal, Rule 5-2.

[2] The State filed a separate petition against another minor, T.B., alleging the commission of the same offenses alleged herein, based on the same event. Thus, the proceedings in both cases were combined. In T.B.'s case, the juvenile and the State filed appeals in this court. See State in Interest of T.B., 20-0929 (La. App. 1st Cir. ___/___/___).

[3] Davis's friend did not testify at the adjudication hearing. Davis was unable to pronounce Asia's last name, and testimony presented by police officers in this case was inconsistent as to whether her last name was Nguyen or Naquin.

when they initially saw the four youths sitting outside of the hotel's administration building. As Davis was at a stop sign, the youths asked for a ride to the Choctaw Drive and Scenic Highway area, and indicated that they would pay Davis gas money in exchange for giving them the ride. Davis agreed and allowed the youths to enter the backseat of the vehicle. The plans changed when the youths told Davis that she could bring them to wherever she was headed that night instead and that they would walk home from there. Davis testified that she, however, wanted to bring them closer to their home, as they were "kids," and she did not "want them to be out like that." She stated that she did not have a "bad vibe" and was only expecting to give the youths a ride. She ended up taking them to a side street behind a Dollar General store located off Mohican Street and Plank Road. According to Davis, the youths were in her vehicle for at least fifteen minutes and they talked the entire time. She testified that she traveled on River Road, a surface street, as opposed to the interstate.

According to Davis, when they arrived at the parking lot of an abandoned store behind the Dollar General store, she asked for the agreed upon gas money and the youths were "hesitant about it." The youths began exiting her vehicle as she was asking about the money, but unbeknownst to Davis, only three of the youths exited her vehicle while one remained in the backseat "acting like" he was sleeping. As Davis was pulling off, the three youths who had exited the vehicle signaled for her to stop, one stating, "Hold on, my brother is in the car with you." At that point, Davis turned around and realized that one of the youths was still in her vehicle. When Davis slammed on her brakes to stop her vehicle, two of the youths approached the vehicle, one approaching the passenger side where Nguyen was seated, and the other approaching the driver's door where Davis was seated. The youth who approached the passenger side of the vehicle opened the door, put a gun to Nguyen's face, and snatched her bag. The other one then opened Davis's

door and pressed a gun against her left arm. He leaned into the vehicle and took Davis's purse from the floor by the driver's door and then leaned in again to take her cell phone that was connected to the auxiliary cord. The youths then fled from the parking lot.

Several officers with the Baton Rouge Police Department (BRPD) investigated the incident, including the lead investigator, Detective Justin Becnell. Detective Becnell reviewed police reports from other investigating officers, including the original offense report submitted by Officer James Crockett detailing the statements provided by the victims on the night of the incident. Detective Becnell noted that a series of robberies had been occurring in the area. After reviewing other police reports and conducting a query in a law enforcement database, he developed four suspects in this case, M.J., his brother D.J., T.B., and J.J. Detective Becnell created four photographic arrays, including each suspect in an array.

On October 17, 2019, the photographic lineups were presented to Davis, and she identified M.J. and T.B.[4] On October 24, 2019, the suspects were arrested and, according to Detective Becnell, J.J. confessed to his involvement but named as co-perpetrators three other individuals who were not considered suspects in this case. On February 5, 2020, the first day of the adjudication hearing, Davis again identified M.J. and T.B. in court. She specifically identified M.J. as the person who approached her side of the vehicle and stole her items at gunpoint and identified T.B. as the person who approached and robbed Nguyen at gunpoint. On the second day of the adjudication hearing, held on February 13, 2019, J.J. testified that he did not recall his pre-hearing statement and indicated that viewing body-

---

[4] From the photographic lineup that contained a photograph of D.J., Davis did not select the photograph of D.J. but instead selected a photograph of an unidentified male. Detective Becnell noted that the unidentified male had similar facial features and a similar hairstyle as D.J. Davis did not select anyone from the photographic lineup that included a photograph of J.J.

4

cam footage would not help refresh his memory. He testified that he had no memory of the incident.

## SUFFICIENCY OF THE EVIDENCE

In assignment of error number two,[5] M.J. argues that Davis's out-of-court and in-court identifications were suspect and should not, standing alone, support an adjudication. He notes that the police did not find a weapon or any of Davis's property during a search of his home. He contends that the State offered no corroboration other than the fact that when Davis recovered her cell phone, the storage server had been renamed under M.J.'s nickname, Munchie Jones. M.J. notes that one of the admitted perpetrators, J.J., provided other names as co-perpetrators. M.J. also notes that the perpetrators named by J.J., one of whom he claims resembles him, were not included in the photo lineup. The juvenile further notes that in State v. Jones, 94-1098 (La. App. 1st Cir. 6/23/95), 658 So. 2d 307, writ denied, 95-2280 (La. 1/12/96), 666 So. 2d 320, this court set aside the conviction based on a violation of due process caused by the single-photo identification in that case, although the defendant's sufficiency of the evidence claim was rejected therein. M.J. argues that this court should likewise set aside his adjudication based on a due process violation.

---

[5] When issues are raised on appeal both as to the sufficiency of the evidence and as to one or more trial errors, the reviewing court should first address whether there is sufficient evidence to convict or adjudicate because the lack of sufficient evidence to sustain the adjudication would entitle the juvenile to an acquittal under Hudson v. Louisiana, 450 U.S. 40, 44-45, 101 S.Ct. 970, 973, 67 L.Ed.2d 30 (1981). State in Interest of E.S., 18-01763, p. 10 (La. 10/22/19), 285 So. 3d 1046, 1054 n.15. When the entirety of the evidence is insufficient to support the conviction, the accused must be discharged as to that crime, and any discussion of trial error issues as to that crime would be pure dicta since those issues are moot. However, when the entirety of the evidence is sufficient to support the conviction, the accused is not entitled to an acquittal, and the reviewing court must then consider the other assignments of error to determine whether the accused is entitled to a new trial. See State v. Hearold, 603 So. 2d 731, 734 (La. 1992).

In a juvenile adjudication proceeding, the State must prove beyond a reasonable doubt that the child committed a delinquent act alleged in the petition. La. Ch.C. art. 883. The burden of proof, beyond a reasonable doubt, is no less severe than the burden of proof required in an adult proceeding. State in Interest of D.L., Jr., 17-0891, p. 6 (La. App. 1st Cir. 11/1/17), 233 So. 3d 671, 676. Accordingly, in delinquency cases, the standard of review for the sufficiency of evidence is that enunciated in Jackson v. Virginia, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979), i.e., whether viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the State proved the essential elements of the crime beyond a reasonable doubt. See La. C.Cr.P. art. 821(B); State v. Ordodi, 06-0207, p. 10 (La. 11/29/06), 946 So. 2d 654, 660. The Jackson standard is an objective standard for testing the overall evidence, both direct and circumstantial, for reasonable doubt. When analyzing circumstantial evidence, La. R.S. 15:438 provides that, assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence. State ex rel. D.F., 08-0182, p. 5 (La. App. 1st Cir. 6/6/08), 991 So. 2d 1082, 1085, writ denied, 08-1540 (La. 3/27/09), 5 So. 3d 138.

Armed robbery is the taking of anything of value belonging to another from the person of another or that is in the immediate control of another, by use of force or intimidation, while armed with a dangerous weapon. La. R.S. 14:64(A). The State bears the burden of proving the elements of the charged offense, as well as the identity of the defendant as the perpetrator. See State v. Draughn, 05-1825, p. 8 (La. 1/17/07), 950 So. 2d 583, 593, cert. denied, 552 U.S. 1012, 128 S.Ct. 537, 169 L.Ed.2d 377 (2007). Here, M.J. does not argue the State failed to prove a crime occurred, but rather contends his identity as one of the perpetrators was not proven beyond a reasonable doubt.

When the key issue is the defendant's identity as the perpetrator, rather than whether the crime was committed, the State is required to negate any reasonable probability of misidentification. State in Interest of T.H., Jr., 11-2208 (La. App. 1st Cir. 6/7/13), 2013 WL 2487573, at *2. The trier of fact, in this case, the juvenile court, is charged with making credibility determinations. Credibility determinations, as well as the weight to be attributed to the evidence, are soundly within the province of the fact finder. Moreover, conflicting testimony as to factual matters is a question of weight of the evidence, not sufficiency. Such a determination rests solely with the trier of fact who may accept or reject, in whole or in part, the testimony of any witness. State in Interest of T.C., 18-1246, pp. 4-5 (La. App. 1st Cir. 12/21/18), 269 So. 3d 716, 719.

Because a review of the law and facts in a juvenile delinquency proceeding is constitutionally mandated, an appellate court must review the record to determine if the juvenile court was clearly wrong in its factual findings. See La. Const. art. 5, § 10; T.C., 18-1246 at 5, 269 So. 3d at 719-20. In a juvenile case, when there is evidence before the trier of fact that, upon its reasonable evaluation of credibility, furnished a factual basis for its finding, on review the appellate court should not disturb this factual finding in the absence of manifest error. Reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review. State in Interest of D.M., 17-1418, p. 6 (La. App. 1st Cir. 2/21/18), 2018 WL 1007352, at *3.

Early on in his investigation, Detective Becnell learned that M.J., D.J., and T.B. lived in Spanish Arms Apartments, located at 4343 Denham Street, and that J.J. lived near the complex. The apartment complex was located less than a mile from the parking lot where the robbery took place. On October 17, Detective Danny Forbes administered the four photographic arrays created by Detective Becnell, at which point Davis positively identified M.J. and T.B. Detective

7

Becnell also interviewed Davis that day. Following his investigation, on October 24, 2019, Detective Becnell arrested M.J., T.B., and J.J. and executed search warrants at the apartments of the parents of M.J. and T.B. in Spanish Arms, but did not locate any potential firearm used in this case.[6]

Detective Becnell testified that J.J. confessed after his arrest but named three other individuals as co-perpetrators who were not considered suspects in this case, including twin brothers with identical initials of J.C. Detective Becnell further testified that the names provided by J.J. were inconsistent with the information provided by Davis. The officers attempted to ascertain whether the individuals named by J.J. were involved in this case but found no evidence to suggest that they were involved. Detective Becnell noted that the twins were present at Spanish Arms at the time of the arrest of the suspects in this case and/or the execution of the search warrants. He noted that T.B. was much larger and taller than the twin brothers, and T.B.'s hair was clearly distinguishable as it fell over his eyes and face. He also noted that M.J. was more of a "heavy set build." He recalled other discrepancies including drastic differences in appearances, noting that the twins were thin and lean and muscular for their age but did not appear to have yet reached puberty. He further noted that their skin tone was noticeably darker than M.J.'s skin tone.

During his testimony at the adjudication hearing, J.J. confirmed his appearance in body-cam footage, but repeatedly indicated that he did not recall any previous statements or previously naming any individuals. When asked if he had absolutely no memory of this, he stated, "No memory." As he continued to evade questioning, he began to repeatedly respond, "I plead the fifth."

---

[6] Detective Becnell testified that while they did not recover a firearm, they located a magazine that belonged to a firearm that was not located.

Davis confirmed that it was dark when she picked up the four youths, but also confirmed that she was able to see them in her rearview mirror, and noted that the route she took had a lot of streetlights. She described herself as "a very good multitasker" and contended that she kept her eyes on the youths and on the road for her safety. Davis noted that during the ride, she allowed one of the youths to use her cell phone, as he indicated that he wanted to call his mother. Davis also noted that one of the youths gave her an Instagram account name so that they could arrange to "hang out."

Davis also testified about how she observed M.J. and T.B. individually during the robberies. First, she observed T.B. as he opened the passenger door and "snatched" Nguyen's bag. She then observed M.J. as he subsequently approached the driver's door, "snatched" it open, "snatched" Davis's purse, and then "doubled back" and "snatched" Davis's phone from the auxiliary cord. She described the gun held against her arm as black, adding, "Like a regular clip, maybe a nine or something." She further confirmed that she believed it was a real gun.

In the moments following the robbery, Davis initially drove away from the parking lot to seek help from a friend and then decided to drive back to the scene to see if any of her belongings had been dropped. She thereafter proceeded down Plank Road, in the direction that the youths were running when she last saw them. She located them at a gas station on Evangeline Street and Plank Road and chased them in her car across the parking lot. She followed them for about five blocks, exited her vehicle, and chased one of them by foot with a hammer. Davis testified that the youth she chased on foot was not in the courtroom at the time of the hearing, but she noted that he "favors" M.J. and was dressed similarly. Davis was unable to catch up with the unidentified youth and immediately went back to her car when she heard one of the other youths fire a gun. She noted that Nguyen had called the police while she was driving and remained on the phone with them.

9

Davis testified that while she did not know them personally, she had seen the four youths prior to the night in question at teen "parties and stuff." Davis also testified that she previously lived in Spanish Arms Apartments. Davis testified that she was able to obtain their "government names" from someone who lived in the area where she believed the youths lived and obtained at least one group photograph of them before her phone was recovered.

The next day, on October 6, 2019, Davis called the police after tracking the location of her cell phone and determining that it was at Spanish Arms Apartments. Corporal David Bourque and Corporal J. Hollis of the BRPD initially met Davis at the McDonald's near the apartment complex and then proceeded to Spanish Arms Apartments. About fifteen to thirty minutes after the officers met with Davis and unsuccessfully looked for her phone, someone contacted Davis and left her and Nguyen's phones at a gas station a block away from the McDonald's and the apartments. She noted that when she retrieved her phone, things were erased from the phone and the name in the phone, under an email account, was changed to "Munchie Jones." Davis confirmed that she was able to find the four youths on Instagram.

Davis further confirmed that on October 7, the day after she met with Corporal Bourque and Corporal Hollis, she obtained additional photographs of the youths. She testified, "The next day I had my own pictures I got cause I knew what they looked like." Davis confirmed her participation in the pre-hearing photographic lineups conducted by Detective Forbes on October 17 and identified M.J. in court as the person who opened the driver's door and took her items at gunpoint, followed by her in-court identification of T.B. Davis confirmed that she was confident that the two individuals identified in the photographic lineups and again in court were the two who reapproached her car armed with guns.

10

A trier of fact's determination as to the credibility of a witness is a question of fact entitled to great weight, and its determination will not be disturbed unless it is clearly contrary to the evidence. In the absence of internal contradictions and irreconcilable conflicts with physical evidence, the testimony of one witness, if believed by the trier of fact, is sufficient to support an adjudication. T.C., 18-1246 at 5, 269 So. 3d at 719. Based on our review of the record, we cannot say that the juvenile court was clearly wrong in its factual findings. Unlike the situation before this court in Jones, 94-1098 at 6-7, 658 So. 2d at 311-12, the victim in this case was not shown a single photograph of M.J., but instead selected M.J. from an assembled photographic lineup. While Davis had viewed photos prior to the lineup, her testimony showed that her identification of M.J. and T.B. was based on her ability to closely view them on the night in question.

Considering the totality of the circumstances, we find that the evidence presented in this case would support a rational fact finder's conclusion that M.J. took Davis's items at gunpoint in this case. Viewing the evidence in the light most favorable to the prosecution, we find that any rational trier of fact could have found beyond a reasonable doubt and to the exclusion of every reasonable hypothesis of innocence that M.J. was guilty of armed robbery. Thus, after undertaking the constitutionally-mandated review of the law and facts, we find no manifest error by the juvenile court in its adjudication. Assignment of error number two lacks merit.

## MOTION TO SUPPRESS IDENTIFICATION

In assignment of error number one, M.J. contends that the juvenile court erred in denying his motion to exclude the identifications. He challenges the out-of-court identification based on the following five factors: (1) opportunity to view, (2) attention, (3) accuracy of prior description, (4) certainty, and (5) time. He argues that Davis's research on social media and conversations with unidentified

sources concerning the possible identity of suspects had a "corrupting effect" on the subsequent lineup and in-court identification. M.J. argues that there is a "real possibility" that Davis's recollection of him was derived from the Instagram photograph rather than the nighttime encounter. He argues that the likelihood of misidentification in this case denied him his right to due process.

M.J. contends Davis admitted she did not turn around to look at the perpetrators in the backseat. He argues Davis could not have had a clear view of the four youths in the backseat while she was driving or in the dark parking lot. M.J. claims that Davis was not paying attention to the youths as she was driving, as they exited her vehicle, or when they were in the parking lot. He claims Davis had no independent recollection and had to look at photographs in her phone to describe the youths the day after the offense. M.J. further contends Davis did not provide a specific description of the robbers and notes that she misidentified one of the suspects in the lineup. M.J. notes months elapsed between the robbery and the adjudication hearing.

M.J. also contends there is a "reasonable probability" that the three youths identified by J.J., including the J.C. twins, were the actual robbers in this case. M.J. contends he was misidentified as a perpetrator in an unrelated series of thefts and robberies in the area, but a surveillance video showed that one of the twins, who M.J. says resembles him, was the actual robber in that case.[7] M.J. contends that there is a "reasonable possibility" that one of the twins stored his nickname in the victim's phone in this case to frame him. He further contends he was denied the opportunity to show that there was a "very real possibility" of

---

[7] At the adjudication hearing, Detective Jerry Johnson of the BRPD confirmed that M.J. was identified in a photo-lineup in an unrelated investigation of a theft at a Boost Mobile store. As Detective Johnson further testified, surveillance footage showed that M.J. was not involved in that incident, had been misidentified, and that J.C., one of the twins referenced above, committed that theft alone. However, it was confirmed that M.J. and J.J. were in the store with J.C. prior to the theft and that the owner saw all of them while they were in the store.

12

misidentification, as the juvenile court did not allow testimony by Davis at the suppression hearing.

Generally, the defendant has the burden of proof on a motion to suppress an out-of-court identification. La. C.Cr.P. art. 703(D). To suppress an identification, a defendant must first prove that the identification procedure was suggestive. An identification procedure is suggestive if, during the procedure, the witness's attention is unduly focused on the defendant. State in Interest of E.R., 09-0756 (La. App. 1st Cir. 12/23/09), 2009 WL 4981461, at *3. The question for a reviewing court is to determine whether the procedure is so conducive to irreparable misidentification that due process was denied. Manson v. Brathwaite, 432 U.S. 98, 120, 97 S.Ct. 2243, 2256, 53 L.Ed.2d 140 (1977) (citing Stovall v. Denno, 388 U.S. 293, 301-02, 87 S.Ct. 1967, 1972, 18 L.Ed.2d 1199 (1967)); See State v. Martin, 595 So. 2d 592, 595 (La. 1992); State v. Prudholm, 446 So. 2d 729, 738 (La. 1984).

Even when suggestiveness of the identification process is proven by the defendant or presumed by the court, the defendant must also show there was a substantial likelihood of misidentification as a result of the identification procedure. State v. Higgins, 03-1980, p. 19 (La. 4/1/05), 898 So. 2d 1219, 1233, cert. denied, 546 U.S. 883, 126 S.Ct. 182, 163 L.Ed.2d 187 (2005); E.R., 2009 WL 4981461, at *3. The Supreme Court in Manson, 432 U.S. at 116, 97 S.Ct. at 2254, held that despite the existence of a suggestive pretrial identification, an identification may be permissible if there does not exist a "very substantial likelihood of irreparable misidentification." Under Manson, the factors that courts must examine to determine from the totality of the circumstances whether the suggestiveness presents a substantial likelihood of misidentification include: 1) the witness's opportunity to view the criminal at the time of the crime; 2) the witness's degree of attention; 3) the accuracy of his prior description of the criminal; 4) the

13

level of certainty demonstrated at the confrontation; and 5) the time between the crime and the confrontation. Manson, 432 U.S. at 114, 97 S.Ct. at 2253.

A juvenile court's determination of the admissibility of an identification should be accorded great weight and will not be disturbed on appeal unless the evidence reveals an abuse of discretion. See E.R., 2009 WL 4981461, at *5. Likewise, when a trial court denies a motion to suppress, factual and credibility determinations should not be reversed in the absence of a clear abuse of the trial court's discretion, i.e., unless such ruling is not supported by the evidence. See State v. Green, 94-0887, p. 11 (La. 5/22/95), 655 So. 2d 272, 280-81. However, a trial court's legal findings are subject to a de novo standard of review. State v. Hunt, 09-1589, p. 6 (La. 12/1/09), 25 So. 3d 746, 751. In determining whether the ruling on the motion to suppress was correct, we are not limited to the evidence adduced at the hearing on the motion. We may consider all pertinent evidence given at the trial of the case. State v. Chopin, 372 So. 2d 1222, 1223 n.2 (La. 1979); State in Interest of T.O.T., 15-0611 (La. App. 1st Cir. 9/21/15), 2015 WL 5546724, at *3.

Herein, at the hearing on the motion to suppress, Officer Crockett testified that Davis was not looking at her phone when she provided a description of the perpetrators on the date of the incident. Davis specifically described the perpetrators as African American teenagers between the ages of fourteen and eighteen and further noted that one of them was tall and slender, while some of them ranged from short to tall. When Davis met Corporal Bourque and Corporal Hollis at McDonald's the next day, she informed Corporal Bourque that she had a photograph of the juvenile defendants in this case.

Regarding the photographic lineup on October 17, while Detective Becnell was the lead investigator, administering the lineup was Detective Forbes only involvement in this case. Detective Becnell testified that prior to the lineup, Davis

reportedly obtained the identity of the suspects from members of the community and social media. Detective Becnell confirmed that under BRPD general policy orders, witnesses should not be permitted to see or be shown any photos of the suspect prior to the lineup. Detective Becnell further confirmed that he understood the policy to mean that he is not allowed to show witnesses photos of the suspect prior to the lineup. However, he noted that if a witness chooses to do so on their own, he would not be able to prevent it. He added, "Obviously, in an effort to be fair and unbiased, I would encourage the victims not to do their own investigatory work, to let me follow leads and then to contact them."

Dectective Becnell confirmed that he did not show Davis a photograph of M.J. or T.B. prior to the lineup. Davis was shown four six-person photograph arrays. Regarding his selection of photographs for the arrays, Detective Becnell specifically testified:

> It was important for us to make sure that all the photos did not appear unnecessarily suggestive and that they looked the same. We made sure that all the individuals in each sequence of photographic lineups, whether it was one defendant, had similar hair, similar skin tone, the size of the picture was encouraged to be the same. We didn't want any markings, any numbers, any other differences in the styles of the photos. It was important that they were consistent.

Detective Becnell and Detective Forbes testified that they did not suggest anyone to Davis during the lineup procedure. Detective Becnell confirmed that Davis selected the juvenile in this case, M.J., from Lineup Number 1. Detective Becnell further confirmed that Davis selected, from Lineup Number 2, an individual that was not, by any other indication, involved or considered a suspect in the instant case.[8]

In denying the motion to suppress/motion in limine, the juvenile court noted that Davis provided descriptions of the perpetrators on the day of the incident and

---

[8] As previously noted herein, at the adjudication hearing, Detective Becnell confirmed that Davis selected co-defendant T.B. from Lineup Number 3 and did not make a selection from Lineup Number 4.

the following day. Subsequently, the victims did their own investigation and were able to obtain photos of individuals that they believed to be the suspects who robbed them. The court noted that according to the officers' testimony, they did not provide or show the victims any photographs outside of the lineup photographic arrays or make any suggestions to the victims. The court further noted that the victims were not persuaded or influenced in anyway by Detective Becnell and that Detective Forbes had no prior knowledge or involvement in the case. The court also recalled testimony indicating that the photographic lineups featured individuals of similar features, skin tone, and hair, and that there was nothing that would cause a photograph to standout or cause the procedure to be suggestive. The court concluded that the officers did not violate their policy or conduct a suggestive identification procedure.

In State in Interest of E.R., one of three victims of an armed robbery in that case identified E.R. as the robber in a photographic lineup. All three of the victims later appeared for a scheduled adjudication hearing. At some point, the victims were asked to wait outside the courtroom. As the three victims sat outside the courtroom, they all observed E.R. walk into the courtroom wearing leg shackles and clothes from the juvenile detention center. Because one of the State's witnesses was unable to testify at the adjudication hearing, the State obtained a continuance. Subsequently, a motion to suppress identification was filed on behalf of E.R., seeking to suppress any identifications of E.R. by the victims during and subsequent to the date of the "staged viewing" where the witnesses observed E.R. being escorted into the courtroom. E.R., 2009 WL 4981461, at *2-3.

Therein, this court noted that the jurisprudence indicates that when an immediate and definite identification results from inadvertent meetings between the victim and the suspect, and there is no indication of impropriety or suggestiveness, an out-of-court identification will be found both reliable and

admissible. E.R., 2009 WL 4981461, at *3; State v. Johnson, 94-1561, p. 7 (La. App. 1st Cir. 10/6/95), 664 So. 2d 141, 145, writ denied, 95-2988 (La. 3/15/96), 669 So. 2d 426. After consideration of the evidence under the Manson factors in that case, this court was unable to say the defense established there was a substantial likelihood of irreparable misidentification. E.R., 2009 WL 4981461, at *5. This court, in part, noted that one of the victims testified that he was "certain" that E.R. was the person who robbed him, while the other testified that because E.R. was pointing a gun at him during the robbery, he would "forever remember that face." E.R., 2009 WL 4981461, at *4.

In this case, we agree with the juvenile court in that there is no indication of impropriety or suggestiveness in police procedure in conducting the lineup. Thus, the identification was properly found both reliable and admissible. Even assuming that Davis's opportunity to view photographs of who she believed to be the perpetrators prior to the lineup rendered the subsequent lineup suggestive, M.J. still had to establish that there was a likelihood of misidentification in this case.

At the adjudication hearing, Davis testified that she got a good look at all four perpetrators in her rearview mirror as she was driving. She further testified that she was able to get a good look at both of the armed individuals who reapproached her vehicle after she dropped them off in the parking lot and identified M.J. in court as the one who approached her side of the vehicle. Davis testified that after T.B. snatched Nguyen's bag, M.J. "snatched open" her door and pressed a gun against her left arm. She noted, "It was like 15 seconds back to back." Further, regarding Davis's opportunity to see M.J. when he reapproached her vehicle, she was questioned as follows during direct examination by the State at the adjudication hearing:

> Q.   ...All right. Let me start with, first, did you get a good look at the person that snatched your car door open?

A.  Yes.

Q.  And how far would you say they were from you?

                    *    *    *

A.  Enough arm length for the gun to be to us and them that far away.

Q.  Okay.  And once this person held the gun on you, what did he do?

A.  He snatched my purse and then doubled back and snatched my phone off the aux cord.

Q.  And was your purse in your lap or?

A.  It was on the floor by my door.

Q.  So, Carley, did he have to lean into the car --

A.  Yes.

Based on her testimony, Davis had a significant amount of time to view and paid adequate attention to M.J.  She was initially able to view him while he was in the backseat of her car, and again when he reapproached her car and opened the driver's door where she was sitting, put the gun to her arm, and leaned into the car twice, first to grab her purse and second to grab her phone.  While her description prior to the lineup may have been somewhat general, she seemed to have a certain recollection of the juvenile from the night in question before subsequently seeking his name and photograph.  Only twelve days elapsed between the incident in question and the photographic lineup in which Davis positively identified the juvenile.  Thus, based on the record, we cannot say the defense established that there was a substantial likelihood of misidentification.  We find no abuse of discretion in the denial of the motion to suppress and, alternatively, motion in limine to exclude Davis's out-of-court and subsequent in-court identification of M.J.  Assignment of error number one lacks merit.

**ADJUDICATION AND DISPOSITION AFFIRMED.**

STATE OF LOUISIANA

COURT OF APPEAL

FIRST CIRCUIT

2020 KJ 0928

STATE OF LOUISIANA

IN THE INTEREST OF M.J.

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**McClendon, J., concurring.**

Based on the totality of the record, I concur in the result reached by the majority.